# ATKINS *v.* VIRGINIA

No. 00–8452.  Argued February 20, 2002—Decided June 20, 2002

STEVENS, J., delivered the opinion of the Court, in which O'CONNOR, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. REHNQUIST, C. J., filed a dissenting opinion, in which SCALIA and THOMAS, JJ., joined, *post*, p. 321. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., and THOMAS, J., joined, *post*, p. 337.

*James W. Ellis* argued the cause for petitioner. With him on the briefs were *Robert E. Lee,* by appointment of the Court, 534 U. S. 1122, *Mark E. Olive,* and *Charles E. Haden.*

*Pamela A. Rumpz,* Assistant Attorney General of Virginia, argued the cause for respondent. With her on the brief was *Randolph A. Beales,* Attorney General.*

JUSTICE STEVENS delivered the opinion of the Court.

Those mentally retarded persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes. Because of their disabilities in areas of reasoning, judgment, and control of their impulses, however, they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct. Moreover, their impairments can jeopardize the

---

*Briefs of *amici curiae* urging affirmance were filed for the State of Alabama et al. by *Bill Pryor,* Attorney General of Alabama, and *J. Clayton Crenshaw, Henry M. Johnson, James R. Houts, A. Vernon Barnett IV, Michael B. Billingsley,* and *David R. Clark,* Assistant Attorneys General, *Michael C. Moore,* Attorney General of Mississippi, *Frankie Sue Del Papa,* Attorney General of Nevada, *Charles M. Condon,* Attorney General of South Carolina, and *Mark L. Shurtleff,* Attorney General of Utah; and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger* and *Charles L. Hobson.*

reliability and fairness of capital proceedings against mentally retarded defendants. Presumably for these reasons, in the 13 years since we decided *Penry* v. *Lynaugh*, 492 U. S. 302 (1989), the American public, legislators, scholars, and judges have deliberated over the question whether the death penalty should ever be imposed on a mentally retarded criminal. The consensus reflected in those deliberations informs our answer to the question presented by this case: whether such executions are "cruel and unusual punishments" prohibited by the Eighth Amendment to the Federal Constitution.

## I

Petitioner, Daryl Renard Atkins, was convicted of abduction, armed robbery, and capital murder, and sentenced to death. At approximately midnight on August 16, 1996, Atkins and William Jones, armed with a semiautomatic handgun, abducted Eric Nesbitt, robbed him of the money on his person, drove him to an automated teller machine in his pickup truck where cameras recorded their withdrawal of additional cash, then took him to an isolated location where he was shot eight times and killed.

Jones and Atkins both testified in the guilt phase of Atkins' trial.[1] Each confirmed most of the details in the other's account of the incident, with the important exception that each stated that the other had actually shot and killed Nesbitt. Jones' testimony, which was both more coherent and credible than Atkins', was obviously credited by the jury and was sufficient to establish Atkins' guilt.[2] At the penalty

---

[1] Initially, both Jones and Atkins were indicted for capital murder. The prosecution ultimately permitted Jones to plead guilty to first-degree murder in exchange for his testimony against Atkins. As a result of the plea, Jones became ineligible to receive the death penalty.

[2] Highly damaging to the credibility of Atkins' testimony was its substantial inconsistency with the statement he gave to the police upon his arrest. Jones, in contrast, had declined to make an initial statement to the authorities.

phase of the trial, the State introduced victim impact evidence and proved two aggravating circumstances: future dangerousness and "vileness of the offense." To prove future dangerousness, the State relied on Atkins' prior felony convictions as well as the testimony of four victims of earlier robberies and assaults. To prove the second aggravator, the prosecution relied upon the trial record, including pictures of the deceased's body and the autopsy report.

In the penalty phase, the defense relied on one witness, Dr. Evan Nelson, a forensic psychologist who had evaluated Atkins before trial and concluded that he was "mildly mentally retarded."[3] His conclusion was based on interviews with people who knew Atkins,[4] a review of school and court

---

[3] The American Association on Mental Retardation (AAMR) defines mental retardation as follows: "*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 1992).

The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000). "Mild" mental retardation is typically used to describe people with an IQ level of 50–55 to approximately 70. *Id.*, at 42–43.

[4] The doctor interviewed Atkins, members of his family, and deputies at the jail where he had been incarcerated for the preceding 18 months. Dr. Nelson also reviewed the statements that Atkins had given to the police and the investigative reports concerning this case.

records, and the administration of a standard intelligence test which indicated that Atkins had a full scale IQ of 59.[5]

The jury sentenced Atkins to death, but the Virginia Supreme Court ordered a second sentencing hearing because the trial court had used a misleading verdict form. 257 Va. 160, 510 S. E. 2d 445 (1999). At the resentencing, Dr. Nelson again testified. The State presented an expert rebuttal witness, Dr. Stanton Samenow, who expressed the opinion that Atkins was not mentally retarded, but rather was of "average intelligence, at least," and diagnosable as having antisocial personality disorder.[6] App. 476. The jury again sentenced Atkins to death.

---

[5] Dr. Nelson administered the Wechsler Adult Intelligence Scales test (WAIS–III), the standard instrument in the United States for assessing intellectual functioning. AAMR, Mental Retardation, *supra.* The WAIS–III is scored by adding together the number of points earned on different subtests, and using a mathematical formula to convert this raw score into a scaled score. The test measures an intelligence range from 45 to 155. The mean score of the test is 100, which means that a person receiving a score of 100 is considered to have an average level of cognitive functioning. A. Kaufman & E. Lichtenberger, Essentials of WAIS–III Assessment 60 (1999). It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition. 2 Kaplan & Sadock's Comprehensive Textbook of Psychiatry 2952 (B. Sadock & V. Sadock eds. 7th ed. 2000).

At the sentencing phase, Dr. Nelson testified: "[Atkins'] full scale IQ is 59. Compared to the population at large, that means less than one percentile. . . . Mental retardation is a relatively rare thing. It's about one percent of the population." App. 274. According to Dr. Nelson, Atkins' IQ score "would automatically qualify for Social Security disability income." *Id.,* at 280. Dr. Nelson also indicated that of the over 40 capital defendants that he had evaluated, Atkins was only the second individual who met the criteria for mental retardation. *Id.,* at 310. He testified that, in his opinion, Atkins' limited intellect had been a consistent feature throughout his life, and that his IQ score of 59 is not an "aberration, malingered result, or invalid test score." *Id.,* at 308.

[6] Dr. Samenow's testimony was based upon two interviews with Atkins, a review of his school records, and interviews with correctional staff. He did not administer an intelligence test, but did ask Atkins questions taken from the 1972 version of the Wechsler Memory Scale. *Id.,* at 524–525,

The Supreme Court of Virginia affirmed the imposition of the death penalty. 260 Va. 375, 385, 534 S. E. 2d 312, 318 (2000). Atkins did not argue before the Virginia Supreme Court that his sentence was disproportionate to penalties imposed for similar crimes in Virginia, but he did contend "that he is mentally retarded and thus cannot be sentenced to death." *Id.*, at 386, 534 S. E. 2d, at 318. The majority of the state court rejected this contention, relying on our holding in *Penry.* 260 Va., at 387, 534 S. E. 2d, at 319. The court was "not willing to commute Atkins' sentence of death to life imprisonment merely because of his IQ score." *Id.*, at 390, 534 S. E. 2d, at 321.

Justice Hassell and Justice Koontz dissented. They rejected Dr. Samenow's opinion that Atkins possesses average intelligence as "incredulous as a matter of law," and concluded that "the imposition of the sentence of death upon a criminal defendant who has the mental age of a child between the ages of 9 and 12 is excessive." *Id.*, at 394, 395–396, 534 S. E. 2d, at 323–324. In their opinion, "it is indefensible to conclude that individuals who are mentally retarded are not to some degree less culpable for their criminal acts. By definition, such individuals have substantial limitations not shared by the general population. A moral and civilized society diminishes itself if its system of justice does not afford recognition and consideration of those limitations in a meaningful way." *Id.*, at 397, 534 S. E. 2d, at 325.

Because of the gravity of the concerns expressed by the dissenters, and in light of the dramatic shift in the state legislative landscape that has occurred in the past 13 years, we granted certiorari to revisit the issue that we first addressed in the *Penry* case. 533 U. S. 976 (2001).

---

529. Dr. Samenow attributed Atkins' "academic performance [that was] by and large terrible" to the fact that he "is a person who chose to pay attention sometimes, not to pay attention others, and did poorly because he did not want to do what he was required to do." *Id.*, at 480–481.

## II

The Eighth Amendment succinctly prohibits "[e]xcessive" sanctions. It provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." In *Weems* v. *United States*, 217 U. S. 349 (1910), we held that a punishment of 12 years jailed in irons at hard and painful labor for the crime of falsifying records was excessive. We explained "that it is a precept of justice that punishment for crime should be graduated and proportioned to [the] offense." *Id.*, at 367. We have repeatedly applied this proportionality precept in later cases interpreting the Eighth Amendment. See *Harmelin* v. *Michigan*, 501 U. S. 957, 997–998 (1991) (KENNEDY, J., concurring in part and concurring in judgment); see also *id.*, at 1009–1011 (White, J., dissenting).[7] Thus, even though "imprisonment for ninety days is not, in the abstract, a punishment which is either cruel or unusual," it may not be imposed as a penalty for "the 'status' of narcotic addiction," *Robinson* v. *California*, 370 U. S. 660, 666–667 (1962), because such a sanction would be excessive. As Justice Stewart explained in *Robinson:* "Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." *Id.*, at 667.

A claim that punishment is excessive is judged not by the standards that prevailed in 1685 when Lord Jeffreys presided over the "Bloody Assizes" or when the Bill of Rights was adopted, but rather by those that currently prevail. As Chief Justice Warren explained in his opinion in *Trop* v. *Dulles*, 356 U. S. 86 (1958): "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. . . . The Amendment must draw its meaning from the

---

[7] Thus, we have read the text of the Amendment to prohibit all excessive punishments, as well as cruel and unusual punishments that may or may not be excessive.

evolving standards of decency that mark the progress of a maturing society." *Id.*, at 100–101.

Proportionality review under those evolving standards should be informed by "'objective factors to the maximum possible extent,'" see *Harmelin*, 501 U. S., at 1000 (quoting *Rummel* v. *Estelle*, 445 U. S. 263, 274–275 (1980)). We have pinpointed that the "clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." *Penry*, 492 U. S., at 331. Relying in part on such legislative evidence, we have held that death is an impermissibly excessive punishment for the rape of an adult woman, *Coker* v. *Georgia*, 433 U. S. 584, 593–596 (1977), or for a defendant who neither took life, attempted to take life, nor intended to take life, *Enmund* v. *Florida*, 458 U. S. 782, 789–793 (1982). In *Coker*, we focused primarily on the then-recent legislation that had been enacted in response to our decision 10 years earlier in *Furman* v. *Georgia*, 408 U. S. 238 (1972) *(per curiam)*, to support the conclusion that the "current judgment," though "not wholly unanimous," weighed very heavily on the side of rejecting capital punishment as a "suitable penalty for raping an adult woman." *Coker*, 433 U. S., at 596. The "current legislative judgment" relevant to our decision in *Enmund* was less clear than in *Coker* but "nevertheless weigh[ed] on the side of rejecting capital punishment for the crime at issue." *Enmund*, 458 U. S., at 793.

We also acknowledged in *Coker* that the objective evidence, though of great importance, did not "wholly determine" the controversy, "for the Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment." 433 U. S., at 597. For example, in *Enmund*, we concluded by expressing our own judgment about the issue:

> "For purposes of imposing the death penalty, Enmund's criminal *culpability* must be limited to his participation

in the robbery, and his punishment must be tailored to his personal responsibility and moral guilt. Putting Enmund to death to avenge two killings that he did not commit and had no intention of committing or causing does not measurably contribute to the retributive end of ensuring that the criminal gets his just deserts. This is the judgment of most of *the legislatures that have recently addressed the matter, and we have no reason to disagree with that judgment* for purposes of construing and applying the Eighth Amendment." 458 U. S., at 801 (emphasis added).

Thus, in cases involving a consensus, our own judgment is "brought to bear," *Coker,* 433 U. S., at 597, by asking whether there is reason to disagree with the judgment reached by the citizenry and its legislators.

Guided by our approach in these cases, we shall first review the judgment of legislatures that have addressed the suitability of imposing the death penalty on the mentally retarded and then consider reasons for agreeing or disagreeing with their judgment.

### III

The parties have not called our attention to any state legislative consideration of the suitability of imposing the death penalty on mentally retarded offenders prior to 1986. In that year, the public reaction to the execution of a mentally retarded murderer in Georgia[8] apparently led to the enact-

---

[8] Jerome Bowden, who was identified as having mental retardation when he was 14 years old, was scheduled for imminent execution in Georgia in June 1986. The Georgia Board of Pardons and Paroles granted a stay following public protests over his execution. A psychologist selected by the State evaluated Bowden and determined that he had an IQ of 65, which is consistent with mental retardation. Nevertheless, the board lifted the stay and Bowden was executed the following day. The board concluded that Bowden understood the nature of his crime and his punishment and therefore that execution, despite his mental deficiencies, was permissible. See Montgomery, Bowden's Execution Stirs Protest, Atlanta Journal, Oct. 13, 1986, p. A1.

ment of the first state statute prohibiting such executions.[9] In 1988, when Congress enacted legislation reinstating the federal death penalty, it expressly provided that a "sentence of death shall not be carried out upon a person who is mentally retarded."[10] In 1989, Maryland enacted a similar prohibition.[11] It was in that year that we decided *Penry*, and concluded that those two state enactments, "even when added to the 14 States that have rejected capital punishment completely, do not provide sufficient evidence at present of a national consensus." 492 U. S., at 334.

Much has changed since then. Responding to the national attention received by the Bowden execution and our decision in *Penry*, state legislatures across the country began to address the issue. In 1990, Kentucky and Tennessee enacted statutes similar to those in Georgia and Maryland, as did New Mexico in 1991, and Arkansas, Colorado, Washington, Indiana, and Kansas in 1993 and 1994.[12] In 1995, when New York reinstated its death penalty, it emulated the Federal Government by expressly exempting the mentally retarded.[13] Nebraska followed suit in 1998.[14] There appear

---

[9] Ga. Code Ann. § 17–7–131(j) (Supp. 1988).

[10] The Anti-Drug Abuse Act of 1988, Pub. L. 100–690, § 7001(*l*), 102 Stat. 4390, 21 U. S. C. § 848(*l*). Congress expanded the federal death penalty law in 1994. It again included a provision that prohibited any individual with mental retardation from being sentenced to death or executed. Federal Death Penalty Act of 1994, 18 U. S. C. § 3596(c).

[11] Md. Ann. Code, Art. 27, § 412(f)(1) (1989).

[12] Ky. Rev. Stat. Ann. §§ 532.130, 532.135, 532.140; Tenn. Code Ann. § 39–13–203; N. M. Stat. Ann. § 31–20A–2.1; Ark. Code Ann. § 5–4–618; Colo. Rev. Stat. § 16–9–401; Wash. Rev. Code § 10.95.030; Ind. Code §§ 35–36–9–2 through 35–36–9–6; Kan. Stat. Ann. § 21–4623.

[13] N. Y. Crim. Proc. Law § 400.27. However, New York law provides that a sentence of death "may not be set aside . . . upon the ground that the defendant is mentally retarded" if "the killing occurred while the defendant was confined or under custody in a state correctional facility or local correctional institution." N. Y. Crim. Proc. Law § 400.27.12(d) (McKinney 2001–2002 Interim Pocket Part).

[14] Neb. Rev. Stat. § 28–105.01.

to have been no similar enactments during the next two years, but in 2000 and 2001 six more States—South Dakota, Arizona, Connecticut, Florida, Missouri, and North Carolina—joined the procession.[15] The Texas Legislature unanimously adopted a similar bill,[16] and bills have passed at least one house in other States, including Virginia and Nevada.[17]

It is not so much the number of these States that is significant, but the consistency of the direction of change.[18] Given the well-known fact that anticrime legislation is far more popular than legislation providing protections for persons guilty of violent crime, the large number of States prohibiting the execution of mentally retarded persons (and the

---

[15] S. D. Codified Laws § 23A–27A–26.1; Ariz. Rev. Stat. Ann. § 13–703.02; Conn. Gen. Stat. § 53a–46a; Fla. Stat. § 921.137; Mo. Rev. Stat. § 565.030; 2001–346 N. C. Sess. Laws p. 45.

[16] House Bill No. 236 passed the Texas House on April 24, 2001, and the Senate version, S. 686, passed the Texas Senate on May 16, 2001. Governor Perry vetoed the legislation on June 17, 2001. In his veto statement, the Texas Governor did not express dissatisfaction with the principle of categorically excluding the mentally retarded from the death penalty. In fact, he stated: "We do not execute mentally retarded murderers today." See Veto Proclamation for H. B. No. 236. Instead, his motivation to veto the bill was based upon what he perceived as a procedural flaw: "My opposition to this legislation focuses on a serious legal flaw in the bill. House Bill No. 236 would create a system whereby the jury and judge are asked to make the same determination based on two different sets of facts. . . . Also of grave concern is the fact that the provision that sets up this legally flawed process never received a public hearing during the legislative process." *Ibid.*

[17] Virginia Senate Bill No. 497 (2002); House Bill No. 957 (2002); see also Nevada Assembly Bill 353 (2001). Furthermore, a commission on capital punishment in Illinois has recently recommended that Illinois adopt a statute prohibiting the execution of mentally retarded offenders. Report of the Governor's Commission on Capital Punishment 156 (Apr. 2002).

[18] A comparison to *Stanford* v. *Kentucky*, 492 U. S. 361 (1989), in which we held that there was no national consensus prohibiting the execution of juvenile offenders over age 15, is telling. Although we decided *Stanford* on the same day as *Penry*, apparently only two state legislatures have raised the threshold age for imposition of the death penalty. Mont. Code Ann. § 45–5–102 (1999); Ind. Code § 35–50–2–3 (1998).

complete absence of States passing legislation reinstating the power to conduct such executions) provides powerful evidence that today our society views mentally retarded offenders as categorically less culpable than the average criminal. The evidence carries even greater force when it is noted that the legislatures that have addressed the issue have voted overwhelmingly in favor of the prohibition.[19]   Moreover, even in those States that allow the execution of mentally retarded offenders, the practice is uncommon.   Some States, for example New Hampshire and New Jersey, continue to authorize executions, but none have been carried out in decades.   Thus there is little need to pursue legislation barring the execution of the mentally retarded in those States.   And it appears that even among those States that regularly execute offenders and that have no prohibition with regard to the mentally retarded, only five have executed offenders possessing a known IQ less than 70 since we decided *Penry*.[20] The practice, therefore, has become truly unusual, and it is fair to say that a national consensus has developed against it.[21]

---

[19] App. D to Brief for AAMR et al. as *Amici Curiae*.

[20] Those States are Alabama, Texas, Louisiana, South Carolina, and Virginia.   D. Keyes, W. Edwards, & R. Perske, People with Mental Retardation are Dying Legally, 35 Mental Retardation (Feb. 1997) (updated by Death Penalty Information Center, available at http://www.advocacyone.org/deathpenalty.html (as visited June 18, 2002)).

[21] Additional evidence makes it clear that this legislative judgment reflects a much broader social and professional consensus.   For example, several organizations with germane expertise have adopted official positions opposing the imposition of the death penalty upon a mentally retarded offender.   See Brief for American Psychological Association et al. as *Amici Curiae;* Brief for AAMR et al. as *Amici Curiae*.   In addition, representatives of widely diverse religious communities in the United States, reflecting Christian, Jewish, Muslim, and Buddhist traditions, have filed an *amicus curiae* brief explaining that even though their views about the death penalty differ, they all "share a conviction that the execution of persons with mental retardation cannot be morally justified."   Brief for United States Catholic Conference et al. as *Amici Curiae* 2.   More-

To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. In this case, for instance, the Commonwealth of Virginia disputes that Atkins suffers from mental retardation. Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in *Ford v. Wainwright*, 477 U. S. 399 (1986), with regard to insanity, "we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Id.*, at 405, 416–417.[22]

## IV

This consensus unquestionably reflects widespread judgment about the relative culpability of mentally retarded offenders, and the relationship between mental retardation and the penological purposes served by the death penalty. Additionally, it suggests that some characteristics of mental retardation undermine the strength of the procedural protections that our capital jurisprudence steadfastly guards.

---

over, within the world community, the imposition of the death penalty for crimes committed by mentally retarded offenders is overwhelmingly disapproved. Brief for European Union as *Amicus Curiae* 4. Finally, polling data shows a widespread consensus among Americans, even those who support the death penalty, that executing the mentally retarded is wrong. Bonner & Rimer, Executing the Mentally Retarded Even as Laws Begin to Shift, N. Y. Times, Aug. 7, 2000, p. A1; App. B to Brief for AAMR et al. as *Amici Curiae* (appending approximately 20 state and national polls on the issue). Although these factors are by no means dispositive, their consistency with the legislative evidence lends further support to our conclusion that there is a consensus among those who have addressed the issue. See *Thompson* v. *Oklahoma*, 487 U. S. 815, 830, 831, n. 31 (1988) (considering the views of "respected professional organizations, by other nations that share our Anglo-American heritage, and by the leading members of the Western European community").

[22] The statutory definitions of mental retardation are not identical, but generally conform to the clinical definitions set forth in n. 3, *supra*.

As discussed above, clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18. Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others.[23] There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders.[24] Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

In light of these deficiencies, our death penalty jurisprudence provides two reasons consistent with the legislative consensus that the mentally retarded should be categorically excluded from execution. First, there is a serious question as to whether either justification that we have recognized as

---

[23] J. McGee & F. Menolascino, The Evaluation of Defendants with Mental Retardation in the Criminal Justice System, in The Criminal Justice System and Mental Retardation 55, 58–60 (R. Conley, R. Luckasson, & G. Bouthilet eds. 1992); Appelbaum & Appelbaum, Criminal-Justice Related Competencies in Defendants with Mental Retardation, 14 J. of Psychiatry & L. 483, 487–489 (Winter 1994).

[24] See, e. g., Ellis & Luckasson, Mentally Retarded Criminal Defendants, 53 Geo. Wash. L. Rev. 414, 429 (1985); Levy-Shiff, Kedem, & Sevillia, Ego Identity in Mentally Retarded Adolescents, 94 Am. J. Mental Retardation 541, 547 (1990); Whitman, Self Regulation and Mental Retardation, 94 Am. J. Mental Retardation 347, 360 (1990); Everington & Fulero, Competence to Confess: Measuring Understanding and Suggestibility of Defendants with Mental Retardation, 37 Mental Retardation 212, 212–213, 535 (1999) (hereinafter Everington & Fulero).

a basis for the death penalty applies to mentally retarded offenders. *Gregg* v. *Georgia,* 428 U. S. 153, 183 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.), identified "retribution and deterrence of capital crimes by prospective offenders" as the social purposes served by the death penalty. Unless the imposition of the death penalty on a mentally retarded person "measurably contributes to one or both of these goals, it 'is nothing more than the purposeless and needless imposition of pain and suffering,' and hence an unconstitutional punishment." *Enmund,* 458 U. S., at 798.

With respect to retribution—the interest in seeing that the offender gets his "just deserts"—the severity of the appropriate punishment necessarily depends on the culpability of the offender. Since *Gregg,* our jurisprudence has consistently confined the imposition of the death penalty to a narrow category of the most serious crimes. For example, in *Godfrey* v. *Georgia,* 446 U. S. 420 (1980), we set aside a death sentence because the petitioner's crimes did not reflect "a consciousness materially more 'depraved' than that of any person guilty of murder." *Id.,* at 433. If the culpability of the average murderer is insufficient to justify the most extreme sanction available to the State, the lesser culpability of the mentally retarded offender surely does not merit that form of retribution. Thus, pursuant to our narrowing jurisprudence, which seeks to ensure that only the most deserving of execution are put to death, an exclusion for the mentally retarded is appropriate.

With respect to deterrence—the interest in preventing capital crimes by prospective offenders—"it seems likely that 'capital punishment can serve as a deterrent only when murder is the result of premeditation and deliberation,'" *Enmund,* 458 U. S., at 799. Exempting the mentally retarded from that punishment will not affect the "cold calculus that precedes the decision" of other potential murderers. *Gregg,* 428 U. S., at 186. Indeed, that sort of calculus is at the opposite end of the spectrum from behavior of mentally retarded

offenders. The theory of deterrence in capital sentencing is predicated upon the notion that the increased severity of the punishment will inhibit criminal actors from carrying out murderous conduct. Yet it is the same cognitive and behavioral impairments that make these defendants less morally culpable—for example, the diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses—that also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information. Nor will exempting the mentally retarded from execution lessen the deterrent effect of the death penalty with respect to offenders who are not mentally retarded. Such individuals are unprotected by the exemption and will continue to face the threat of execution. Thus, executing the mentally retarded will not measurably further the goal of deterrence.

The reduced capacity of mentally retarded offenders provides a second justification for a categorical rule making such offenders ineligible for the death penalty. The risk "that the death penalty will be imposed in spite of factors which may call for a less severe penalty," *Lockett* v. *Ohio*, 438 U. S. 586, 605 (1978), is enhanced, not only by the possibility of false confessions,[25] but also by the lesser ability of mentally retarded defendants to make a persuasive showing of mitigation in the face of prosecutorial evidence of one or more aggravating factors. Mentally retarded defendants may be less able to give meaningful assistance to their counsel and

---

[25] See Everington & Fulero 212–213. Despite the heavy burden that the prosecution must shoulder in capital cases, we cannot ignore the fact that in recent years a disturbing number of inmates on death row have been exonerated. These exonerations have included at least one mentally retarded person who unwittingly confessed to a crime that he did not commit. See Baker, Death-Row Inmate Gets Clemency; Agreement Ends Day of Suspense, Washington Post, Jan. 15, 1994, p. A1.

are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes. As *Penry* demonstrated, moreover, reliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury. 492 U. S., at 323–325. Mentally retarded defendants in the aggregate face a special risk of wrongful execution.

Our independent evaluation of the issue reveals no reason to disagree with the judgment of "the legislatures that have recently addressed the matter" and concluded that death is not a suitable punishment for a mentally retarded criminal. We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty. Construing and applying the Eighth Amendment in the light of our "evolving standards of decency," we therefore conclude that such punishment is excessive and that the Constitution "places a substantive restriction on the State's power to take the life" of a mentally retarded offender. *Ford,* 477 U. S., at 405.

The judgment of the Virginia Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

CHIEF JUSTICE REHNQUIST, with whom JUSTICE SCALIA and JUSTICE THOMAS join, dissenting.

The question presented by this case is whether a national consensus deprives Virginia of the constitutional power to impose the death penalty on capital murder defendants like petitioner, *i. e.,* those defendants who indisputably are competent to stand trial, aware of the punishment they are about to suffer and why, and whose mental retardation has been found an insufficiently compelling reason to lessen their individual responsibility for the crime. The Court pronounces

the punishment cruel and unusual primarily because 18 States recently have passed laws limiting the death eligibility of certain defendants based on mental retardation alone, despite the fact that the laws of 19 other States besides Virginia continue to leave the question of proper punishment to the individuated consideration of sentencing judges or juries familiar with the particular offender and his or her crime. See *ante*, at 314–315.

I agree with JUSTICE SCALIA, *post*, at 337–338 (dissenting opinion), that the Court's assessment of the current legislative judgment regarding the execution of defendants like petitioner more resembles a *post hoc* rationalization for the majority's subjectively preferred result rather than any objective effort to ascertain the content of an evolving standard of decency. I write separately, however, to call attention to the defects in the Court's decision to place weight on foreign laws, the views of professional and religious organizations, and opinion polls in reaching its conclusion. See *ante*, at 316–317, n. 21. The Court's suggestion that these sources are relevant to the constitutional question finds little support in our precedents and, in my view, is antithetical to considerations of federalism, which instruct that any "permanent prohibition upon all units of democratic government must [be apparent] in the operative acts (laws and the application of laws) that the people have approved." *Stanford* v. *Kentucky*, 492 U. S. 361, 377 (1989) (plurality opinion). The Court's uncritical acceptance of the opinion poll data brought to our attention, moreover, warrants additional comment, because we lack sufficient information to conclude that the surveys were conducted in accordance with generally accepted scientific principles or are capable of supporting valid empirical inferences about the issue before us.

In making determinations about whether a punishment is "cruel and unusual" under the evolving standards of decency embraced by the Eighth Amendment, we have emphasized that legislation is the "clearest and most reliable objective

evidence of contemporary values." *Penry* v. *Lynaugh*, 492 U. S. 302, 331 (1989). See also *McCleskey* v. *Kemp*, 481 U. S. 279, 300 (1987). The reason we ascribe primacy to legislative enactments follows from the constitutional role legislatures play in expressing policy of a State. "'[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people.'" *Gregg* v. *Georgia*, 428 U. S. 153, 175–176 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.) (quoting *Furman* v. *Georgia*, 408 U. S. 238, 383 (1972) (Burger, C. J., dissenting)). And because the specifications of punishments are "peculiarly questions of legislative policy," *Gore* v. *United States*, 357 U. S. 386, 393 (1958), our cases have cautioned against using "'the aegis of the Cruel and Unusual Punishment Clause'" to cut off the normal democratic processes, *Gregg*, *supra*, at 176 (quoting *Powell* v. *Texas*, 392 U. S. 514, 533 (1968) (plurality opinion)).

Our opinions have also recognized that data concerning the actions of sentencing juries, though entitled to less weight than legislative judgments, "'is a significant and reliable objective index of contemporary values,'" *Coker* v. *Georgia*, 433 U. S. 584, 596 (1977) (plurality opinion) (quoting *Gregg*, *supra*, at 181), because of the jury's intimate involvement in the case and its function of "'maintain[ing] a link between contemporary community values and the penal system,'" *Gregg*, *supra*, at 181 (quoting *Witherspoon* v. *Illinois*, 391 U. S. 510, 519, n. 15 (1968)). In *Coker*, *supra*, at 596–597, for example, we credited data showing that "at least 9 out of 10" juries in Georgia did not impose the death sentence for rape convictions. And in *Enmund* v. *Florida*, 458 U. S. 782, 793–794 (1982), where evidence of the current legislative judgment was not as "compelling" as that in *Coker* (but more so than that here), we were persuaded by "overwhelming [evidence] that American juries . . . repudiated imposition of the death penalty" for a defendant who neither took life nor attempted or intended to take life.

In my view, these two sources—the work product of legislatures and sentencing jury determinations—ought to be the sole indicators by which courts ascertain the contemporary American conceptions of decency for purposes of the Eighth Amendment. They are the only objective indicia of contemporary values firmly supported by our precedents. More importantly, however, they can be reconciled with the undeniable precepts that the democratic branches of government and individual sentencing juries are, by design, better suited than courts to evaluating and giving effect to the complex societal and moral considerations that inform the selection of publicly acceptable criminal punishments.

In reaching its conclusion today, the Court does not take notice of the fact that neither petitioner nor his *amici* have adduced any comprehensive statistics that would conclusively prove (or disprove) whether juries routinely consider death a disproportionate punishment for mentally retarded offenders like petitioner.* Instead, it adverts to the fact that other countries have disapproved imposition of the death penalty for crimes committed by mentally retarded offenders, see *ante*, at 316–317, n. 21 (citing the Brief for European Union as *Amicus Curiae* 2). I fail to see, how-

---

*Apparently no such statistics exist. See Brief for American Association on Mental Retardation et al. as *Amici Curiae* 19, n. 29 (noting that "actions by individual prosecutors and by juries are difficult to quantify with precision"). Petitioner's inability to muster studies in his favor ought to cut against him, for it is his "heavy burden," *Stanford* v. *Kentucky*, 492 U. S. 361, 373 (1989) (internal quotation marks omitted), to establish a national consensus against a punishment deemed acceptable by the Virginia Legislature and jury who sentenced him. Furthermore, it is worth noting that experts have estimated that as many as 10 percent of death row inmates are mentally retarded, see R. Bonner & S. Rimer, Executing the Mentally Retarded Even as Laws Begin to Shift, N. Y. Times, Aug. 7, 2000, p. A1, a number which suggests that sentencing juries are not as reluctant to impose the death penalty on defendants like petitioner as was the case in *Coker* v. *Georgia*, 433 U. S. 584 (1977), and *Enmund* v. *Florida*, 458 U. S. 782 (1982).

ever, how the views of other countries regarding the punishment of their citizens provide any support for the Court's ultimate determination. While it is true that some of our prior opinions have looked to "the climate of international opinion," *Coker, supra,* at 596, n. 10, to reinforce a conclusion regarding evolving standards of decency, see *Thompson* v. *Oklahoma,* 487 U. S. 815, 830 (1988) (plurality opinion); *Enmund, supra,* at 796–797, n. 22; *Trop* v. *Dulles,* 356 U. S. 86, 102–103 (1958) (plurality opinion); we have since explicitly rejected the idea that the sentencing practices of other countries could "serve to establish the first Eighth Amendment prerequisite, that [a] practice is accepted among our people." *Stanford,* 492 U. S., at 369, n. 1 (emphasizing that *"American* conceptions of decency . . . are dispositive" (emphasis in original)).

*Stanford's* reasoning makes perfectly good sense, and the Court offers no basis to question it. For if it is evidence of a *national* consensus for which we are looking, then the viewpoints of other countries simply are not relevant. And nothing in *Thompson, Enmund, Coker,* or *Trop* suggests otherwise. *Thompson, Enmund,* and *Coker* rely only on the bare citation of international laws by the *Trop* plurality as authority to deem other countries' sentencing choices germane. But the *Trop* plurality—representing the view of only a minority of the Court—offered no explanation for its own citation, and there is no reason to resurrect this view given our sound rejection of the argument in *Stanford.*

To further buttress its appraisal of contemporary societal values, the Court marshals public opinion poll results and evidence that several professional organizations and religious groups have adopted official positions opposing the imposition of the death penalty upon mentally retarded offenders. See *ante,* at 316–317, n. 21 (citing Brief for American Psychological Association et al. as *Amici Curiae;* Brief for American Association on Mental Retardation et al. as *Amici Curiae;* noting that "representatives of widely diverse reli-

gious communities . . . reflecting Christian, Jewish, Muslim, and Buddhist traditions . . . 'share a conviction that the execution of persons with mental retardation cannot be morally justified' "; and stating that "polling data shows a widespread consensus among Americans . . . that executing the mentally retarded is wrong"). In my view, none should be accorded any weight on the Eighth Amendment scale when the elected representatives of a State's populace have not deemed them persuasive enough to prompt legislative action. In *Penry*, 492 U. S., at 334–335, we were cited similar data and declined to take them into consideration where the "public sentiment expressed in [them]" had yet to find expression in state law. See also *Stanford*, 492 U. S., at 377 (plurality opinion) (refusing "the invitation to rest constitutional law upon such uncertain foundations" as "public opinion polls, the views of interest groups, and the positions adopted by various professional associations"). For the Court to rely on such data today serves only to illustrate its willingness to proscribe by judicial fiat—at the behest of private organizations speaking only for themselves—a punishment about which no across-the-board consensus has developed through the workings of normal democratic processes in the laboratories of the States.

Even if I were to accept the legitimacy of the Court's decision to reach beyond the product of legislatures and practices of sentencing juries to discern a national standard of decency, I would take issue with the blind-faith credence it accords the opinion polls brought to our attention. An extensive body of social science literature describes how methodological and other errors can affect the reliability and validity of estimates about the opinions and attitudes of a population derived from various sampling techniques. Everything from variations in the survey methodology, such as the choice of the target population, the sampling design used, the questions asked, and the statistical analyses used to interpret the data can skew the results. See, *e. g.,* R. Groves, Survey

Errors and Survey Costs (1989); 1 C. Turner & E. Martin, Surveying Subjective Phenomena (1984).

The Federal Judicial Center's Reference Manual on Scientific Evidence 221–271 (1994) and its Manual for Complex Litigation § 21.493, pp. 101–103 (3d ed. 1995), offer helpful suggestions to judges called upon to assess the weight and admissibility of survey evidence on a factual issue before a court. Looking at the polling data (reproduced in the Appendix to this opinion) in light of these factors, one cannot help but observe how unlikely it is that the data could support a valid inference about the question presented by this case. For example, the questions reported to have been asked in the various polls do not appear designed to gauge whether the respondents might find the death penalty an acceptable punishment for mentally retarded offenders in rare cases. Most are categorical (e. g., "Do you think that persons convicted of murder who are mentally retarded should or should not receive the death penalty?"), and, as such, would not elicit whether the respondent might agree or disagree that all mentally retarded people by definition can never act with the level of culpability associated with the death penalty, regardless of the severity of their impairment or the individual circumstances of their crime. Second, none of the 27 polls cited disclose the targeted survey population or the sampling techniques used by those who conducted the research. Thus, even if one accepts that the survey instruments were adequately designed to address a relevant question, it is impossible to know whether the sample was representative enough or the methodology sufficiently sound to tell us anything about the opinions of the citizens of a particular State or the American public at large. Finally, the information provided to us does not indicate why a particular survey was conducted or, in a few cases, by whom, factors which also can bear on the objectivity of the results. In order to be credited here, such surveys should be offered as

evidence at trial, where their sponsors can be examined and cross-examined about these matters.

\* \* \*

There are strong reasons for limiting our inquiry into what constitutes an evolving standard of decency under the Eighth Amendment to the laws passed by legislatures and the practices of sentencing juries in America. Here, the Court goes beyond these well-established objective indicators of contemporary values. It finds "further support to [its] conclusion" that a national consensus has developed against imposing the death penalty on all mentally retarded defendants in international opinion, the views of professional and religious organizations, and opinion polls not demonstrated to be reliable. *Ante,* at 317, n. 21. Believing this view to be seriously mistaken, I dissent.

## APPENDIX TO OPINION OF REHNQUIST, C. J.

Poll and survey results reported in Brief for American Association on Mental Retardation et al. as *Amici Curiae* 3a–7a, and cited by the Court, *ante,* at 317, n. 21:

| STATE | POLL | DATE | RESPONSE | QUESTION |
|---|---|---|---|---|
| AR | Arkansans' Opinion on the Death Penalty, Opinion Research Associates, Inc., Q. 13 (July 1992)<br><br>John DiPippa, *Will Fairchild's Death Violate the Constitution, or Simply Our Morality?,* Arkansas Forum, Sept. 1993 | 1992 | 61% never appropriate 17% is appropriate 5% opposed to all executions 17% undecided | "Some people say that there is nothing wrong with executing a person who is mentally retarded. Others say that the death penalty should never be imposed on a person who is mentally retarded. Which of these positions comes closest to your own?" |

| STATE | POLL | DATE | RESPONSE | QUESTION |
|---|---|---|---|---|
| AZ | Behavior Research Center, Survey 2000, Q. 3 (July 2000) | 2000 | 71% oppose 12% favor 11% depends 6% ref/unsure | "For persons convicted of murder, do you favor or oppose use of the death penalty when the defendant is mentally retarded?" |
| CA | Field Research Corp., California Death Penalty Survey, Q. 22 (Dec. 1989)<br><br>Frank Hill, *Death Penalty For The Retarded*, San Diego Union-Tribune, Mar. 28, 1993, at G3 | 1989 | 64.8% not all right 25.7% is all right 9.5% no opinion | "Some people feel there is nothing wrong with imposing the death penalty on persons who are mentally retarded depending on the circum-stances. Others feel the death penalty should never be imposed on persons who are mentally retarded under any circumstance. The death penalty on a mentally retarded person is . . . ?" |
| CA | Field Research Corp., California Death Penalty Survey, Q. 62D (Feb. 1997)<br><br>Paul Van Slambrouck, *Execution and a Convict's Mental State*, The Christian Science Monitor, Apr. 27, 1998, at 1 | 1997 | 74% disagree 17% agree 9% no opinion | "Mentally retarded defendants should be given the death penalty when they commit capital crimes." |
| CT | Quinnipac University | 2001 | 77% no 12% yes | "Do you think that persons convicted of |

| STATE | POLL | DATE | RESPONSE | QUESTION |
|-------|------|------|----------|----------|
|  | Polling Institute, Death Penalty Survey Info., Q. 35 (Apr. 23, 2001) |  | 11% don't know | murder who are mentally retarded should or should not receive the death penalty?" |
| FL | Amnesty International<br><br>Martin Dyckman, *Death Penalty's High Price*, St. Petersburg Times, Apr. 19, 1992, at 3D | 1986 | 71% opposed | [not provided] |
| GA | Georgia State University<br><br>Tracy Thompson, *Executions of Retarded Opposed*, Atlanta Journal, Jan. 6, 1987, at 1B | 1987 | 66% opposed<br>17% favor<br>16% depends | [not provided] |
| LA | Marketing Research Inst., Loyola Death Penalty Survey, Q. 7 (Feb. 1993) | 1993 | 77.7% no<br>9.2% yes<br>13% uncertain | "Would you vote for the death penalty if the convicted person is mentally retarded?" |
| LA | Louisiana Poll, Poll 104, Q. 9 (Apr. 2001) | 2001 | 68% no<br>19% yes<br>11% no opinion<br>2% won't say | "Do you believe mentally retarded people, who are convicted of capital murder, should be executed?" |
| MD | Survey Research Center, University of Maryland (Nov. 1988) | 1988 | 82% opposed<br>8% favor<br>10% other | "Would you favor or oppose the death penalty for a person convicted of murder if he or she is mentally retarded?" |

| STATE | POLL | DATE | RESPONSE | QUESTION |
|---|---|---|---|---|
| MO | Missouri Mental Retardation and Death Penalty Survey, Q. 5 (Oct. 1993) | 1993 | 61.3% not all right<br>23.7% is all right<br>15% don't know | "Some people feel there is nothing wrong with imposing the death penalty on *persons who are mentally retarded* depending on the circumstances. Others feel that the death penalty should never be imposed on persons who are mentally retarded under any circumstances. Do you think it IS or IS NOT all right to impose the death penalty on a mentally retarded person?" |
| NC/SC | Charlotte Observer-WMTV News Poll (Sept. 2000)<br><br>Diane Suchetka, *Carolinas Join Emotional Debate Over Executing Mentally Retarded*, Charlotte Observer, Sept. 13, 2000 | 2000 | 64% yes<br>21% no<br>14% not sure | "Should the Carolinas ban the execution of people with mental retardation?" |
| NM | Research & Polling Inc., Use of the Death Penalty Public Opinion Poll, Q. 2 (Dec. 1990) | 1990 | 57.1% oppose<br>10.5% support<br>26.2% depends<br>6.1% don't know | 62% support the death penalty. Asked of those that support it, "for which of the following do you support use of the |

| STATE | POLL | DATE | RESPONSE | QUESTION |
|-------|------|------|----------|----------|
| | | | | death penalty . . . when the convicted person is mentally retarded?" |
| NY | Patrick Caddell Enterprises, NY Public Opinion Poll, The Death Penalty: An Executive Summary, Q. 27 (May 1989)<br><br>Ronald Tabak & J. Mark Lane, *The Execution of Injustice: A Cost and Lack-of-Benefit Analysis of the Death Penalty*, 23 Loyola (LA) L. Rev. 59, 93 (1989) | 1989 | 82% oppose 10% favor 9% don't know | "I'd like you to imagine you are a member of a jury. The jury has found the defendant guilty of murder beyond a reasonable doubt and now needs to decide about sentencing. You are the last juror to decide and your decision will determine whether or not the offender will receive the death penalty. Would you favor or oppose sentencing the offender to the death penalty if . . . the convicted person were mentally retarded?" |
| OK | Survey of Oklahoma Attitudes Regarding Capital Punishment: Survey Conducted for Oklahoma Indigent Defense System, Q. C (July 1999) | 1999 | 83.5% should not be executed 10.8% should be executed 5.7% depends | "Some people think that persons convicted of murder who are mentally retarded (or have a mental age of between 5 and 10 years) should not be executed. Other people think that 'retarded' persons should be subject to the death penalty like anyone else. Which is closer to |

| STATE | POLL | DATE | RESPONSE | QUESTION |
|-------|------|------|----------|----------|
| | | | | the way you feel, that 'retarded' persons should not be executed, or that 'retarded' persons should be subject to the death penalty like everyone else?" |
| TX | Austin American Statesman, Nov. 15, 1988, at B3 | 1988 | 73% opposed | [not provided] |
| TX | Sam Houston State University, College of Criminal Justice, Texas Crime Poll On-line (1995) <br><br> Domingo Ramirez, Jr., *Murder Trial May Hinge on Defendant's IQ*, The Fort Worth Star-Telegram, Oct. 6, 1997, at 1 | 1995 | 61% more likely to oppose | "For each of the following items that have been found to affect people's attitude about the death penalty, please state if you would be more likely to favor or more likely to oppose the death penalty, or wouldn't it matter . . . if the murderer is severely mentally retarded?" |
| TX | Scripps-Howard Texas Poll: Death Penalty (Mar. 2001) <br><br> Dan Parker, *Most Texans Support Death Penalty*, Corpus Christi Caller-Times, Mar. 2, 2001, at A1 | 2001 | 66% no <br> 17% yes <br> 17% don't know/no answer | "Should the state use the death penalty when the inmate is considered mentally retarded?" |

| STATE | POLL | DATE | RESPONSE | QUESTION |
|-------|------|------|----------|----------|
| TX | Houston Chronicle (Feb. 2001)<br><br>Stephen Brewer & Mike Tolson, *A Deadly Distinction: Part III, Debate Fervent in Mental Cases, Johnny Paul Penry Illustrates a Lingering Capital Conundrum*, The Houston Chronicle, Feb. 6, 2001, at A6 | 2001 | 59.9% no support<br>19.3% support<br>20.7% not sure/ no answer | "Would you support the death penalty if you were convinced the defendant were guilty, but the defendant is mentally impaired?" |
| US | Harris Poll, Unfinished Agenda on Race, Q. 32 (Sept. 1988)<br><br>Saundra Torry, *High Court to Hear Case on Retarded Slayer*, The Washington Post, Jan. 11, 1989, at A6 | 1988 | 71% should not be executed<br>21% should be executed<br>4% depends<br>3% not sure/ refused | "Some people think that persons convicted of murder who have a mental age of less than 18 (or the 'retarded') should not be executed. Other people think that 'retarded' persons should be subject to the death penalty like anyone else. Which is closer to the way you feel, that 'retarded' persons should not be executed, or that 'retarded' persons should be subject to the death penalty like anyone else?" |

| STATE | POLL | DATE | RESPONSE | QUESTION |
|-------|------|------|----------|----------|
| US | Yankelovich Clancy Shulman, Time/CNN Poll, Q. 14 (July 7, 1989)<br><br>Samuel R. Gross, *Second Thoughts: Americans' Views on the Death Penalty at the Turn of the Century*, Capital Punishment and the American Future (Feb. 2001) | 1989 | 61% oppose<br>27% favor<br>12% not sure | "Do you favor or oppose the death penalty for mentally retarded individuals convicted of serious crimes, such as murder?" |
| US | The Tarrance Group, Death Penalty Poll, Q. 9 (Mar. 1993)<br><br>Samuel R. Gross, *Update: American Public Opinion on the Death Penalty—It's Getting Personal*, 83 Cornell L. Rev. 1448, 1467 (1998) | 1993 | 56% not all right<br>32% is all right<br>11% unsure | "Some people feel that there is nothing wrong with imposing the death penalty on persons who are mentally retarded, depending on the circumstances. Others feel that the death penalty should never be imposed on persons who are mentally retarded under any circumstances. Which of these views comes closest to your own?" |
| US | Public Policy Research, Crime in America, Q. 72 (July 1995) | 1995 | 67% likely to oppose<br>7% likely to favor<br>26% wouldn't matter | "For each item please tell me if you would be more likely to favor the death penalty, more likely to oppose the death |

| STATE | POLL | DATE | RESPONSE | QUESTION |
|---|---|---|---|---|
|  |  |  |  | penalty or it wouldn't matter . . . if it is true that the murderer is severely mentally retarded?" |
| US | Princeton Research, Newsweek Poll, Q. 16 (Nov. 1995)<br><br>Samuel R. Gross, *Update: American Public Opinion on the Death Penalty—It's Getting Personal*, 83 Cornell L. Rev. 1448, 1468 (1998) | 1995 | 83% oppose<br>9% favor<br>8% don't know refused | "If the convicted person was . . . mentally retarded, would you favor or oppose the death penalty?" |
| US | Peter Hart Research Associates, Inc., Innocence Survey, Q. 12 (Dec. 1999) | 1999 | 58% strongly/ somewhat favor<br>26% strongly/ somewhat oppose<br>12% mixed/ neutral<br>4% not sure | ". . . [F]or each proposal I read, please tell me whether you strongly favor, somewhat favor, have mixed or neutral feelings, somewhat oppose, or strongly oppose that proposal . . . . [P]rohibit the death penalty for defendants who are mentally retarded." |
| US | Peter Hart Research Associates, Inc., Innocence Survey, Q. 9 (Dec. 1999) | 1999 | 72% much/ somewhat less likely<br>19% no difference<br>9% not sure<br>47% much less likely | "Suppose you were on a jury and a defendant was convicted of murder. "Now it is time to determine the sentence. If you knew that the |

| STATE | POLL | DATE | RESPONSE | QUESTION |
|-------|------|------|----------|----------|
| | | | 25% somewhat less likely | defendant was mentally retarded or otherwise mentally impaired in a serious way, would you be much less likely to support the use of the death penalty in this specific case, somewhat less likely, or would it make no difference to you?" |
| US | Houston Chronicle (Feb. 2001) Stephen Brewer & Mike Tolson, *A Deadly Distinction: Part III, Debate Fervent in Mental Cases, Johnny Paul Penry Illustrates a Lingering Capital Conundrum,* The Houston Chronicle, Feb. 6, 2001, at A6 | 2001 | 63.8% no support 16.4% support 19.8% not sure/ no answer | "Would you support the death penalty if you were convinced the defendant were guilty, but the defendant is mentally impaired?" |

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, dissenting.

Today's decision is the pinnacle of our Eighth Amendment death-is-different jurisprudence. Not only does it, like all of that jurisprudence, find no support in the text or history of the Eighth Amendment; it does not even have support in current social attitudes regarding the conditions that render

an otherwise just death penalty inappropriate. Seldom has an opinion of this Court rested so obviously upon nothing but the personal views of its Members.

I

I begin with a brief restatement of facts that are abridged by the Court but important to understanding this case. After spending the day drinking alcohol and smoking marijuana, petitioner Daryl Renard Atkins and a partner in crime drove to a convenience store, intending to rob a customer. Their victim was Eric Nesbitt, an airman from Langley Air Force Base, whom they abducted, drove to a nearby automated teller machine, and forced to withdraw $200. They then drove him to a deserted area, ignoring his pleas to leave him unharmed. According to the co-conspirator, whose testimony the jury evidently credited, Atkins ordered Nesbitt out of the vehicle and, after he had taken only a few steps, shot him one, two, three, four, five, six, seven, eight times in the thorax, chest, abdomen, arms, and legs.

The jury convicted Atkins of capital murder. At resentencing (the Virginia Supreme Court affirmed his conviction but remanded for resentencing because the trial court had used an improper verdict form, 257 Va. 160, 179, 510 S. E. 2d 445, 457 (1999)), the jury heard extensive evidence of petitioner's alleged mental retardation. A psychologist testified that petitioner was mildly mentally retarded with an IQ of 59, that he was a "slow learner," App. 444, who showed a "lack of success in pretty much every domain of his life," id., at 442, and that he had an "impaired" capacity to appreciate the criminality of his conduct and to conform his conduct to the law, id., at 453. Petitioner's family members offered additional evidence in support of his mental retardation claim (e. g., that petitioner is a "follower," id., at 421). The Commonwealth contested the evidence of retardation and presented testimony of a psychologist who found "absolutely no evidence other than the IQ score . . . indicating that [peti-

tioner] was in the least bit mentally retarded" and concluded that petitioner was "of average intelligence, at least." *Id.,* at 476.

The jury also heard testimony about petitioner's 16 prior felony convictions for robbery, attempted robbery, abduction, use of a firearm, and maiming. *Id.,* at 491–522. The victims of these offenses provided graphic depictions of petitioner's violent tendencies: He hit one over the head with a beer bottle, *id.,* at 406; he slapped a gun across another victim's face, clubbed her in the head with it, knocked her to the ground, and then helped her up, only to shoot her in the stomach, *id.,* at 411–413. The jury sentenced petitioner to death. The Supreme Court of Virginia affirmed petitioner's sentence. 260 Va. 375, 534 S. E. 2d 312 (2000).

## II

As the foregoing history demonstrates, petitioner's mental retardation was a *central issue* at sentencing. The jury concluded, however, that his alleged retardation was not a compelling reason to exempt him from the death penalty in light of the brutality of his crime and his long demonstrated propensity for violence. "In upsetting this particularized judgment on the basis of a constitutional absolute," the Court concludes that no one who is even slightly mentally retarded can have sufficient "moral responsibility to be subjected to capital punishment for any crime. As a sociological and moral conclusion that is implausible; and it is doubly implausible as an interpretation of the United States Constitution." *Thompson* v. *Oklahoma,* 487 U. S. 815, 863–864 (1988) (SCALIA, J., dissenting).

Under our Eighth Amendment jurisprudence, a punishment is "cruel and unusual" if it falls within one of two categories: "those modes or acts of punishment that had been considered cruel and unusual at the time that the Bill of Rights was adopted," *Ford* v. *Wainwright,* 477 U. S. 399, 405 (1986), and modes of punishment that are inconsistent with

modern "'standards of decency,'" as evinced by objective indicia, the most important of which is "legislation enacted by the country's legislatures," *Penry* v. *Lynaugh*, 492 U. S. 302, 330–331 (1989).

The Court makes no pretense that execution of the mildly mentally retarded would have been considered "cruel and unusual" in 1791. Only the *severely* or *profoundly* mentally retarded, commonly known as "idiots," enjoyed any special status under the law at that time. They, like lunatics, suffered a "deficiency in will" rendering them unable to tell right from wrong. 4 W. Blackstone, Commentaries on the Laws of England 24 (1769) (hereinafter Blackstone); see also *Penry*, 492 U. S., at 331–332 ("[T]he term 'idiot' was generally used to describe persons who had a total lack of reason or understanding, or an inability to distinguish between good and evil"); *id.*, at 333 (citing sources indicating that idiots generally had an IQ of 25 or below, which would place them within the "profound" or "severe" range of mental retardation under modern standards); 2 A. Fitz-Herbert, *Natura Brevium* 233B (9th ed. 1794) (originally published 1534) (An idiot is "such a person who cannot account or number twenty pence, nor can tell who was his father or mother, nor how old he is, etc., so as it may appear that he hath no understanding of reason what shall be for his profit, or what for his loss"). Due to their incompetence, idiots were "excuse[d] from the guilt, and of course from the punishment, of any criminal action committed under such deprivation of the senses." 4 Blackstone 25; see also *Penry, supra,* at 331. Instead, they were often committed to civil confinement or made wards of the State, thereby preventing them from "go[ing] loose, to the terror of the king's subjects." 4 Blackstone 25; see also S. Brakel, J. Parry, & B. Weiner, The Mentally Disabled and the Law 12–14 (3d ed. 1985); 1 Blackstone 292–296; 1 M. Hale, Pleas of the Crown 33 (1st Am. ed. 1847). Mentally retarded offenders with less severe impairments—those who were not "idiots"—suffered criminal prosecution

and punishment, including capital punishment. See, *e. g.,* I. Ray, Medical Jurisprudence of Insanity 65, 87–92 (W. Overholser ed. 1962) (recounting the 1834 trial and execution in Concord, New Hampshire, of an apparent "imbecile"—imbecility being a less severe form of retardation which "differs from idiocy in the circumstance that while in [the idiot] there is an utter destitution of every thing like reason, [imbeciles] possess some intellectual capacity, though infinitely less than is possessed by the great mass of mankind"); A. Highmore, Law of Idiocy and Lunacy 200 (1807) ("The great difficulty in all these cases, is to determine where a person shall be said to be so far deprived of his sense and memory as not to have any of his actions imputed to him: or where notwithstanding some defects of this kind he still appears to have so much reason and understanding as will make him accountable for his actions . . .").

The Court is left to argue, therefore, that execution of the mildly retarded is inconsistent with the "evolving standards of decency that mark the progress of a maturing society." *Trop* v. *Dulles,* 356 U. S. 86, 101 (1958) (plurality opinion) (Warren, C. J.). Before today, our opinions consistently emphasized that Eighth Amendment judgments regarding the existence of social "standards" "should be informed by objective factors to the maximum possible extent" and "should not be, or appear to be, merely the subjective views of individual Justices." *Coker* v. *Georgia,* 433 U. S. 584, 592 (1977) (plurality opinion); see also *Stanford* v. *Kentucky,* 492 U. S. 361, 369 (1989); *McCleskey* v. *Kemp,* 481 U. S. 279, 300 (1987); *Enmund* v. *Florida,* 458 U. S. 782, 788 (1982). "First" among these objective factors are the "statutes passed by society's elected representatives," *Stanford, supra,* at 370; because it "will rarely if ever be the case that the Members of this Court will have a better sense of the evolution in views of the American people than do their elected representatives," *Thompson, supra,* at 865 (SCALIA, J., dissenting).

The Court pays lipservice to these precedents as it miraculously extracts a "national consensus" forbidding execution of the mentally retarded, *ante,* at 316, from the fact that 18 States—less than *half* (47%) of the 38 States that permit capital punishment (for whom the issue exists)—have very recently enacted legislation barring execution of the mentally retarded. Even that 47% figure is a distorted one. If one is to say, as the Court does today, that *all* executions of the mentally retarded are so morally repugnant as to violate our national "standards of decency," surely the "consensus" it points to must be one that has set its righteous face against *all* such executions. Not 18 States, but only 7—18% of death penalty jurisdictions—have legislation of that scope. Eleven of those that the Court counts enacted statutes prohibiting execution of mentally retarded defendants *convicted after, or convicted of crimes committed after, the effective date* of the legislation;[1] those already on death row, or consigned there before the statute's effective date, or even (in those States using the date of the crime as the criterion of retroactivity) tried in the future for murders committed many years ago, could be put to death. That is not a statement of absolute moral repugnance, but one of current preference between two tolerable approaches. Two of these States permit execution of the mentally retarded in other situations as well: Kansas apparently permits execution of all

---

[1] See Ariz. Rev. Stat. Ann. § 13–703.02(I) (Supp. 2001); Ark. Code Ann. § 5–4–618(d)(1) (1997); *Reams* v. *State,* 322 Ark. 336, 340, 909 S. W. 2d 324, 326–327 (1995); Fla. Stat. § 921.137(8) (Supp. 2002); Ga. Code Ann. § 17–7–131(j) (1997); Ind. Code § 35–36–9–6 (1998); *Rondon* v. *State,* 711 N. E. 2d 506, 512 (Ind. 1999); Kan. Stat. Ann. §§ 21–4623(d), 21–4631(c) (1995); Ky. Rev. Stat. Ann. § 532.140(3) (1999); Md. Ann. Code, Art. 27, § 412(g) (1996); *Booth* v. *State,* 327 Md. 142, 166–167, 608 A. 2d 162, 174 (1992); Mo. Rev. Stat. § 565.030(7) (Supp. 2001); N. Y. Crim. Proc. Law § 400.27.12(c) (McKinney Supp. 2002); 1995 N. Y. Laws, ch. 1, § 38; Tenn. Code Ann. § 39–13–203(b) (1997); *Van Tran* v. *State,* 66 S. W. 3d 790, 798–799 (Tenn. 2001).

except the *severely* mentally retarded;[2] New York permits execution of the mentally retarded who commit murder in a correctional facility. N. Y. Crim. Proc. Law § 400.27.12(d) (McKinney 2001); N. Y. Penal Law § 125.27 (McKinney 2002).

But let us accept, for the sake of argument, the Court's faulty count. That bare number of States alone—*18*—should be enough to convince any reasonable person that no "national consensus" exists. How is it possible that agreement among 47% of the death penalty jurisdictions amounts to "consensus"? Our prior cases have generally required a much higher degree of agreement before finding a punishment cruel and unusual on "evolving standards" grounds. In *Coker, supra,* at 595–596, we proscribed the death penalty for rape of an adult woman after finding that only one jurisdiction, Georgia, authorized such a punishment. In *Enmund, supra,* at 789, we invalidated the death penalty for mere participation in a robbery in which an accomplice took a life, a punishment not permitted in 28 of the death penalty States (78%). In *Ford,* 477 U. S., at 408, we supported the common-law prohibition of execution of the insane with the observation that "[t]his ancestral legacy has not outlived its time," since not a single State authorizes such punishment. In *Solem* v. *Helm,* 463 U. S. 277, 300 (1983), we invalidated a life sentence without parole under a recidivist statute by which the criminal "was treated more severely than he would have been in any other State." What the Court calls evidence of "consensus" in the present case (a fudged 47%) more closely resembles evidence that we found *inadequate*

---

[2] The Kansas statute defines "mentally retarded" as "having significantly subaverage general intellectual functioning . . . to an extent which substantially impairs one's capacity to appreciate the criminality of one's conduct or to conform one's conduct to the requirements of law." Kan. Stat. Ann. § 21–4623(e) (2001). This definition of retardation, petitioner concedes, is analogous to the Model Penal Code's definition of a "mental disease or defect" excusing responsibility for criminal conduct, see ALI, Model Penal Code § 4.01 (1985), which would not include mild mental retardation. Reply Brief for Petitioner 3, n. 4.

to establish consensus in earlier cases. *Tison* v. *Arizona*, 481 U. S. 137, 154, 158 (1987), upheld a state law authorizing capital punishment for major participation in a felony with reckless indifference to life where only 11 of the 37 death penalty States (30%) prohibited such punishment. *Stanford*, 492 U. S., at 372, upheld a state law permitting execution of defendants who committed a capital crime at age 16 where only 15 of the 36 death penalty States (42%) prohibited death for such offenders.

Moreover, a major factor that the Court entirely disregards is that the legislation of all 18 States it relies on is still in its infancy. The oldest of the statutes is only 14 years old;[3] five were enacted last year;[4] over half were enacted within the past eight years.[5] Few, if any, of the States have had sufficient experience with these laws to know whether they are sensible in the long term. It is "myopic to base sweeping constitutional principles upon the narrow experience of [a few] years." *Coker*, 433 U. S., at 614 (Burger, C. J., dissenting); see also *Thompson*, 487 U. S., at 854–855 (O'CONNOR, J., concurring in judgment).

The Court attempts to bolster its embarrassingly feeble evidence of "consensus" with the following: "It is not so much the number of these States that is significant, but the *consistency* of the direction of change." *Ante*, at 315 (emphasis added). But in what *other* direction *could we possibly* see change? Given that 14 years ago *all* the death penalty statutes included the mentally retarded, *any* change (except precipitate undoing of what had just been done) was *bound*

---

[3] Ga. Code Ann. § 17–7–131(j).

[4] Ariz. Rev. Stat. Ann. § 13–703.02; Conn. Gen. Stat. § 53a–46a(h); Fla. Stat. § 921.137; Mo. Rev. Stat. §§ 565.030(4)–(7); N. C. Gen. Stat. § 15A–2005.

[5] In addition to the statutes cited n. 4, *supra*, see S. D. Codified Laws § 23A–27A–26.1 (enacted 2000); Neb. Rev. Stat. §§ 28–105.01(2)–(5) (1998); N. Y. Crim. Proc. Law § 400.27(12) (1995); Ind. Code § 35–36–9–6 (1994); Kan. Stat. Ann. § 21–4623 (1994).

*to be* in the one direction the Court finds significant enough to overcome the lack of real consensus. That is to say, to be accurate the Court's "*consistency*-of-the-direction-of-change" point should be recast into the following unimpressive observation: "No State has yet undone its exemption of the mentally retarded, one for as long as 14 whole years." In any event, reliance upon "trends," even those of much longer duration than a mere 14 years, is a perilous basis for constitutional adjudication, as JUSTICE O'CONNOR eloquently explained in *Thompson:*

> "In 1846, Michigan became the first State to abolish the death penalty . . . . In succeeding decades, other American States continued the trend towards abolition . . . . Later, and particularly after World War II, there ensued a steady and dramatic decline in executions . . . . In the 1950's and 1960's, more States abolished or radically restricted capital punishment, and executions ceased completely for several years beginning in 1968. . . .
>
> "In 1972, when this Court heard arguments on the constitutionality of the death penalty, such statistics might have suggested that the practice had become a relic, implicitly rejected by a new societal consensus. . . . We now know that any inference of a societal consensus rejecting the death penalty would have been mistaken. But had this Court then declared the existence of such a consensus, and outlawed capital punishment, legislatures would very likely not have been able to revive it. The mistaken premise of the decision would have been frozen into constitutional law, making it difficult to refute and even more difficult to reject." 487 U. S., at 854–855.

Her words demonstrate, of course, not merely the peril of riding a trend, but also the peril of discerning a consensus where there is none.

The Court's thrashing about for evidence of "consensus" includes reliance upon the *margins* by which state legislatures have enacted bans on execution of the retarded. *Ante,* at 316. Presumably, in applying our Eighth Amendment "evolving-standards-of-decency" jurisprudence, we will henceforth weigh not only how many States have agreed, but how many States have agreed *by how much.* Of course if the percentage of legislators voting for the bill is significant, surely the number of people *represented* by the legislators voting for the bill is also significant: the fact that 49% of the legislators in a State with a population of 60 million voted *against* the bill should be more impressive than the fact that 90% of the legislators in a State with a population of 2 million voted *for* it. (By the way, the population of the death penalty States that exclude the mentally retarded is only 44% of the population of all death penalty States. U. S. Dept. of Commerce, Bureau of Census, Statistical Abstract of the United States 21 (121st ed. 2001).) This is quite absurd. What we have looked for in the past to "evolve" the Eighth Amendment is a consensus of the same sort as the consensus that *adopted* the Eighth Amendment: a consensus of the sovereign States that form the Union, not a nose count of Americans for and against.

Even less compelling (if possible) is the Court's argument, *ante,* at 316, that evidence of "national consensus" is to be found in the infrequency with which retarded persons are executed in States that do not bar their execution. To begin with, what the Court takes as true is in fact quite doubtful. It is not at all clear that execution of the mentally retarded is "uncommon," *ibid.,* as even the sources cited by the Court suggest, see *ante,* at 316, n. 20 (citing D. Keyes, W. Edwards, & R. Perske, People with Mental Retardation are Dying Legally, 35 Mental Retardation (Feb. 1997) (updated by Death Penalty Information Center, available at http://www.advocacyone.org/deathpenalty.html (as visited

June 12, 2002) (showing that 12 States executed 35 allegedly mentally retarded offenders during the period 1984–2000)). See also Bonner & Rimer, Executing the Mentally Retarded Even as Laws Begin to Shift, N. Y. Times, Aug. 7, 2000, p. A1 (reporting that 10% of death row inmates are retarded). *If,* however, execution of the mentally retarded *is* "uncommon"; and if it is not a sufficient explanation of this that the retarded constitute a tiny fraction of society (1% to 3%), Brief for American Psychological Association et al. as *Amici Curiae* 7; then surely the explanation is that mental retardation is a constitutionally mandated mitigating factor at sentencing, *Penry,* 492 U. S., at 328. For that reason, even if there were uniform national sentiment in *favor* of executing the retarded in appropriate cases, one would still expect execution of the mentally retarded to be "uncommon." To adapt to the present case what the Court itself said in *Stanford,* 492 U. S., at 374: "[I]t is not only possible, but overwhelmingly probable, that the very considerations which induce [today's majority] to believe that death should *never* be imposed on [mentally retarded] offenders . . . cause prosecutors and juries to believe that it should *rarely* be imposed."

But the Prize for the Court's Most Feeble Effort to fabricate "national consensus" must go to its appeal (deservedly relegated to a footnote) to the views of assorted professional and religious organizations, members of the so-called "world community," and respondents to opinion polls. *Ante,* at 316–317, n. 21. I agree with THE CHIEF JUSTICE, *ante,* at 325–328 (dissenting opinion), that the views of professional and religious organizations and the results of opinion polls are irrelevant.[6] Equally irrelevant are the practices of the

---

[6] And in some cases positively counterindicative. The Court cites, for example, the views of the United States Catholic Conference, whose members are the active Catholic Bishops of the United States. See *ante,* at 316, n. 21 (citing Brief for United States Catholic Conference et al. as *Amici Curiae* 2). The attitudes of that body regarding crime and punish-

"world community," whose notions of justice are (thankfully) not always those of our people. "We must never forget that it is a Constitution for the United States of America that we are expounding. . . . [W]here there is not first a settled consensus among our own people, the views of other nations, however enlightened the Justices of this Court may think them to be, cannot be imposed upon Americans through the Constitution." *Thompson*, 487 U. S., at 868–869, n. 4 (SCALIA, J., dissenting).

## III

Beyond the empty talk of a "national consensus," the Court gives us a brief glimpse of what really underlies today's decision: pretension to a power confined *neither* by the moral sentiments originally enshrined in the Eighth Amendment (its original meaning) *nor even* by the current moral sentiments of the American people. " '[T]he Constitution,' " the Court says, "contemplates that in the end *our own judgment* will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment.' " *Ante,* at 312 (quoting *Coker*, 433 U. S., at 597) (emphasis added). (The unexpressed reason for this unexpressed "contemplation" of the Constitution is presumably that really good lawyers have moral sentiments superior to those of the common herd, whether in 1791 or today.) The arrogance of this assumption of power takes one's breath away. And it explains, of course, why the Court can be so cavalier about the evidence of consensus. It is just a game, after all. " '[I]n the end,' " *Thompson, supra*, at 823, n. 8 (plurality opinion (quoting *Coker, supra*, at 597 (plurality opinion))), it is the *feelings* and *intuition* of a majority of the Justices that count—"the perceptions of decency, or of penology, or of mercy, entertained . . . by a majority of the small and

---

ment are so far from being representative, even of the views of Catholics, that they are currently the object of intense national (and entirely ecumenical) criticism.

unrepresentative segment of our society that sits on this Court." *Thompson, supra,* at 873 (SCALIA, J., dissenting).

The genuinely operative portion of the opinion, then, is the Court's statement of the reasons why it agrees with the contrived consensus it has found, that the "diminished capacities" of the mentally retarded render the death penalty excessive. *Ante,* at 317–321. The Court's analysis rests on two fundamental assumptions: (1) that the Eighth Amendment prohibits excessive punishments, and (2) that sentencing juries or judges are unable to account properly for the "diminished capacities" of the retarded. The first assumption is wrong, as I explained at length in *Harmelin* v. *Michigan,* 501 U. S. 957, 966–990 (1991) (opinion of SCALIA, J.). The Eighth Amendment is addressed to always-and-everywhere "cruel" punishments, such as the rack and the thumbscrew. But where the punishment is in itself permissible, "[t]he Eighth Amendment is not a ratchet, whereby a temporary consensus on leniency for a particular crime fixes a permanent constitutional maximum, disabling the States from giving effect to altered beliefs and responding to changed social conditions." *Id.,* at 990. The second assumption—inability of judges or juries to take proper account of mental retardation—is not only unsubstantiated, but contradicts the immemorial belief, here and in England, that they play an *indispensable* role in such matters:

> "[I]t is very difficult to define the indivisible line that divides perfect and partial insanity; but it must rest upon circumstances duly to be weighed and considered both by the judge and jury, lest on the one side there be a kind of inhumanity towards the defects of human nature, or on the other side too great an indulgence given to great crimes . . . ." 1 Hale, Pleas of the Crown, at 30.

Proceeding from these faulty assumptions, the Court gives two reasons why the death penalty is an excessive punishment for all mentally retarded offenders. First, the "dimin-

ished capacities" of the mentally retarded raise a "serious question" whether their execution contributes to the "social purposes" of the death penalty, viz., retribution and deterrence. *Ante,* at 318–319. (The Court conveniently ignores a third "social purpose" of the death penalty—"incapacitation of dangerous criminals and the consequent prevention of crimes that they may otherwise commit in the future," *Gregg* v. *Georgia,* 428 U. S. 153, 183, n. 28 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.). But never mind; its discussion of even the other two does not bear analysis.) Retribution is not advanced, the argument goes, because the mentally retarded are *no more culpable* than the average murderer, whom we have already held lacks sufficient culpability to warrant the death penalty, see *Godfrey* v. *Georgia,* 446 U. S. 420, 433 (1980) (plurality opinion). *Ante,* at 319. Who says so? Is there an established correlation between mental acuity and the ability to conform one's conduct to the law in such a rudimentary matter as murder? Are the mentally retarded really more disposed (and hence more likely) to commit willfully cruel and serious crime than others? In my experience, the opposite is true: being childlike generally suggests innocence rather than brutality.

Assuming, however, that there is a direct connection between diminished intelligence and the inability to refrain from murder, what scientific analysis can possibly show that a mildly retarded individual who commits an exquisite torture-killing is "no more culpable" than the "average" murderer in a holdup-gone-wrong or a domestic dispute? Or a moderately retarded individual who commits a series of 20 exquisite torture-killings? Surely culpability, and deservedness of the most severe retribution, depends not merely (if at all) upon the mental capacity of the criminal (above the level where he is able to distinguish right from wrong) but also upon the depravity of the crime—which is precisely why this sort of question has traditionally been thought answerable not by a categorical rule of the sort the Court today

imposes upon all trials, but rather by the sentencer's weighing of the circumstances (both degree of retardation and depravity of crime) in the particular case. The fact that juries continue to sentence mentally retarded offenders to death for extreme crimes shows that society's moral outrage sometimes demands execution of retarded offenders. By what principle of law, science, or logic can the Court pronounce that this is wrong? There is none. Once the Court admits (as it does) that mental retardation does not render the offender morally *blameless, ante,* at 318, there is no basis for saying that the death penalty is *never* appropriate retribution, no matter *how* heinous the crime. As long as a mentally retarded offender knows "the difference between right and wrong," *ibid.,* only the sentencer can assess whether his retardation reduces his culpability enough to exempt him from the death penalty for the particular murder in question.

As for the other social purpose of the death penalty that the Court discusses, deterrence: That is not advanced, the Court tells us, because the mentally retarded are "less likely" than their nonretarded counterparts to "process the information of the possibility of execution as a penalty and . . . control their conduct based upon that information." *Ante,* at 320. Of course this leads to the same conclusion discussed earlier—that the mentally retarded (because they are less deterred) are more likely to kill—which neither I nor the society at large believes. In any event, even the Court does not say that *all* mentally retarded individuals cannot "process the information of the possibility of execution as a penalty and . . . control their conduct based upon that information"; it merely asserts that they are "less likely" to be able to do so. But surely the deterrent effect of a penalty is adequately vindicated if it successfully deters many, but not all, of the target class. Virginia's death penalty, for example, does not fail of its deterrent effect simply because *some* criminals are unaware that Virginia *has* the death penalty. In other words, the supposed fact that *some*

retarded criminals cannot fully appreciate the death penalty has nothing to do with the deterrence rationale, but is simply an echo of the arguments denying a retribution rationale, discussed and rejected above. I am not sure that a murderer is somehow less blameworthy if (though he knew his act was wrong) he did not fully appreciate that he could die for it; but if so, we should treat a mentally retarded murderer the way we treat an offender who may be "less likely" to respond to the death penalty because he was abused as a child. We do not hold him immune from capital punishment, but require his background to be considered by the sentencer as a mitigating factor. *Eddings* v. *Oklahoma*, 455 U. S. 104, 113–117 (1982).

The Court throws one last factor into its grab bag of reasons why execution of the retarded is "excessive" in all cases: Mentally retarded offenders "face a special risk of wrongful execution" because they are less able "to make a persuasive showing of mitigation," "to give meaningful assistance to their counsel," and to be effective witnesses. *Ante,* at 320–321. "Special risk" is pretty flabby language (even flabbier than "less likely")—and I suppose a similar "special risk" could be said to exist for just plain stupid people, inarticulate people, even ugly people. If this unsupported claim has any substance to it (which I doubt), it might support a due process claim in all criminal prosecutions of the mentally retarded; but it is hard to see how it has anything to do with an *Eighth Amendment* claim that execution of the mentally retarded is cruel and unusual. We have never before held it to be cruel and unusual punishment to impose a sentence in violation of some *other* constitutional imperative.

\* \* \*

Today's opinion adds one more to the long list of substantive and procedural requirements impeding imposition of the death penalty imposed under this Court's assumed power to invent a death-is-different jurisprudence. None of those

requirements existed when the Eighth Amendment was adopted, and some of them were not even supported by current moral consensus. They include prohibition of the death penalty for "ordinary" murder, *Godfrey*, 446 U. S., at 433, for rape of an adult woman, *Coker*, 433 U. S., at 592, and for felony murder absent a showing that the defendant possessed a sufficiently culpable state of mind, *Enmund*, 458 U. S., at 801; prohibition of the death penalty for any person under the age of 16 at the time of the crime, *Thompson*, 487 U. S., at 838 (plurality opinion); prohibition of the death penalty as the mandatory punishment for any crime, *Woodson* v. *North Carolina*, 428 U. S. 280, 305 (1976) (plurality opinion), *Sumner* v. *Shuman*, 483 U. S. 66, 77–78 (1987); a requirement that the sentencer not be given unguided discretion, *Furman* v. *Georgia*, 408 U. S. 238 (1972) *(per curiam)*, a requirement that the sentencer be empowered to take into account all mitigating circumstances, *Lockett* v. *Ohio*, 438 U. S. 586, 604 (1978) (plurality opinion), *Eddings* v. *Oklahoma, supra*, at 110; and a requirement that the accused receive a judicial evaluation of his claim of insanity before the sentence can be executed, *Ford*, 477 U. S., at 410–411 (plurality opinion). There is something to be said for popular abolition of the death penalty; there is nothing to be said for its incremental abolition by this Court.

This newest invention promises to be more effective than any of the others in turning the process of capital trial into a game. One need only read the definitions of mental retardation adopted by the American Association on Mental Retardation and the American Psychiatric Association (set forth in the Court's opinion, *ante*, at 308, n. 3) to realize that the symptoms of this condition can readily be feigned. And whereas the capital defendant who feigns insanity risks commitment to a mental institution until he can be cured (and then tried and executed), *Jones* v. *United States*, 463 U. S. 354, 370, and n. 20 (1983), the capital defendant who feigns mental retardation risks nothing at all. The mere pendency

of the present case has brought us petitions by death row inmates claiming for the first time, after multiple habeas petitions, that they are retarded. See, *e. g., Moore* v. *Texas,* 535 U. S. 1044 (2002) (SCALIA, J., dissenting from grant of applications for stay of execution).

Perhaps these practical difficulties will not be experienced by the minority of capital-punishment States that have very recently changed mental retardation from a mitigating factor (to be accepted or rejected by the sentencer) to an absolute immunity. Time will tell—and the brief time those States have had the new disposition in place (an average of 6.8 years) is surely not enough. But if the practical difficulties do not appear, and if the other States share the Court's perceived moral consensus that *all* mental retardation renders the death penalty inappropriate for *all* crimes, then that majority will presumably follow suit. But there is no justification for this Court's pushing them into the experiment— and turning the experiment into a permanent practice—on constitutional pretext. Nothing has changed the accuracy of Matthew Hale's endorsement of the common law's traditional method for taking account of guilt-reducing factors, written over three centuries ago:

> "[Determination of a person's incapacity] is a matter of great difficulty, partly from the easiness of counterfeiting this disability . . . and partly from the variety of the degrees of this infirmity, whereof some are sufficient, and some are insufficient to excuse persons in capital offenses. . . .
> "Yet the law of England hath afforded the best method of trial, that is possible, of this and all other matters of fact, namely, by a jury of twelve men all concurring in the same judgment, by the testimony of witnesses . . . , and by the inspection and direction of the judge." 1 Pleas of the Crown, at 32–33.

I respectfully dissent.