IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. 73,787






MICHAEL WAYNE HALL, Appellant



v.



THE STATE OF TEXAS





ON REMAND FROM 


THE SUPREME COURT OF THE UNITED STATES





 Johnson, J., filed a dissenting opinion, joined by HOLCOMB, J. 


O P I N I O N



 I respectfully dissent. Retardation, like insanity, is a question of fact, not law. We may speak of
satisfying the legal standard for insanity, but we assign the task of determining if a defendant was insane at
the time of the offense to the finder of fact, usually the jury. In this case, the trial court made a finding of
fact (applicant is not retarded) based solely on affidavits (written factual statements) and from that finding
of fact drew a legal conclusion (under Atkins v. Virginia, 536 U.S. 304 (2002), it is not unconstitutional
to execute him). 

 This case was tried before the United States Supreme Court decided Atkins v. Virginia, 536 U.S.
304 (2002), and radically changed the law. We are not free to ignore that change.

 Almost all of the evidence that has been brought forward by either side was adduced during the
punishment phase of the original trial. At that time, mental retardation was a mitigating factor, not a
dispositive issue as to ineligibility for the death penalty; the convicting jury was limited to considering it as
part of the special issues, particularly on the issue of future dangerousness. No trier of fact in this case
has ever heard live testimony, subject to testing on cross-examination, on the specific issue of whether
appellant is mentally retarded. The hearing at issue here was had on affidavits only, thus Appellant's claim
that he is mentally retarded, and therefore is not subject to execution, has never been directly and
thoroughly litigated. 

 That a live, contested hearing is necessary is clear from an examination of the conflicting evidence
adduced at trial. A short summary of the testimony from the punishment phase of appellant's trial illustrates
this.

 Of the fourteen defense witnesses whose testimony about appellant's mental abilities was
considered at the hearing on the writ of habeas corpus, five also testified at trial and had extensive contact
with appellant: his mother, Karen Hall; his brother, Damon Hall; and teachers Ken Traynor, Cheryl Conner,
and Chris Bryce. A psychologist, Dr. Mark Cunningham, also testified at trial. Four others with extensive
contact with appellant testified by affidavits on the writ of habeas corpus; a teacher, Stephen Dollar;
appellant's trial attorneys, William Harris and Pat Conner; and another death-row inmate, Bill Coble. The
other affiants were two private investigators hired by appellant's trial attorneys, Joseph Ward and John
Ladd, and two psychologists, Dr. George Denkowski, and Dr. Sally Church. Linda Akin, an employee
of the school district, did not testify at trial or submit an affidavit. She was mentioned in Dr. Conner's trial
testimony in response to a question from the prosecutor during cross-examination of Dr. Conner regarding
the IQ test that was done by Garland schools as part of the comprehensive individual assessment. (1)
 It is not
even certain that Ms. Akin wrote the assessment under discussion, and in any case, that assessment was
not admitted into evidence.

 Of particular interest here are the affidavits of appellant's attorneys and others who helped prepare
appellant's case for trial. Both attorneys attested that appellant would ask a question, listen to the answer,
say that he understood, then re-ask the same question within a very short time, sometimes within minutes;
he showed little to no understanding of many of the aspects of trial. They soon recognized that appellant
"bitterly did not want people to think him 'dumb'" and would parrot words and phrases he had heard in
an effort to avoid appearing so. Both investigators attested that appellant behaved in ways inappropriate
to his age and did not seem to be able to recall events such as his arrest. Mr. Ladd recounted that
appellant thought himself very clever for being able to get extra food for an evening snack when, in reality,
he was merely saving some of his supper for later.

 Bill Coble has occupied the cell next to appellant as long as appellant has been on death row. Mr.
Coble has been on death row for a long time, knows Johnny Paul Penry, and in his opinion, appellant "is
worse off than Johnny Penry."

 Of the ten state witnesses who claimed personal contact with appellant, none had extensive or
lengthy contact with appellant. Dr. Randall Price, a psychologist, had a single interview with appellant. Al
Boles said that appellant taught him how to perform the simple task of bagging groceries. His testimony,
under questioning by the state, consisted largely of a comparison of the mental limitations of appellant and
those of the victim. Monica Zepeda was a waitress who had a single contact with appellant. The state
represented to the trial court that she was able to testify that appellant showed no remorse; no such
testimony was elicited. Richard Nutt, a detective, testified that he had read the Miranda warnings to
appellant, and that he believed that appellant understood them because he had looked Nutt in the eye and
said he understood. 

 The affidavits of the five prison guards each consist of a few conclusory statements, which are not
infrequently repetitive. Many of the statements in these affidavits, such as "I have heard Michael Hall's
radio on in his cell," are not helpful in assessing appellant's mental abilities. Brandon Daniel worked on
death row once a week. Suzanne Prosperie worked on death row twice a week. Todd Tatum and Darrell
White worked on death row for three months. The affidavit of Julie Perego consists of 6 general,
conclusory statements, including "I have been on this unit since June 2001 and I have been around Michael
Hall at different times." 

 Mental retardation can arise in many ways. The National Center on Birth Defects and
Developmental Disabilities (2) states that retardation may occur before birth, (3) during birth, (4) or after birth from
disease or injury. (5) The United States National Library of Medicine lists more than forty causes, the largest
category being unexplained. (6) Many persons who are, in fact, mentally retarded may appear normal to the
untrained eye or on casual contact and are not identifiable by their manner of speech or their appearance.
A single casual contact, such as waiting on a mildly mentally retarded person in a restaurant, has a high
probability of not revealing the retardation. 

 Lay persons often have unrealistic ideas about what mentally retarded persons look like and how
they act. There is a wide range of abilities encompassed by the term "mentally retarded"; the term applies
equally to those whose are able to live successful independent lives and to those who live and die in a
vegetative state. Mr. Tatum attested that he "knew some kids in school with Down's syndrome" and that
appellant is not retarded. It is well known that Down's syndrome creates a distinctive physical appearance. 
If Down's syndrome is Mr. Tatum's standard for diagnosing mental retardation, then of course, appellant
is not retarded in his eyes. Ms. Prosperie claimed to know that appellant is not retarded because her
neighbor's daughter is retarded. We do not know the extent of that child's retardation or how it manifests
in appearance and behavior. Mr. White said that appellant is not retarded because his uncle is retarded,
and appellant is not like his uncle. Mr. Boles, looking back to the time of the offense, says that appellant
is not retarded, and the state asserts that Boles is qualified to make that judgment because he now works
with mentally challenged children. Each of these lay witnesses appear to have judged appellant's mental
capacity by personal standards formed by personal experience with a very small number of retarded
persons. Given the wide range of manifestations of mental retardation, these witnesses, although sincere,
do not have the experience or training to make any assessment of the mental abilities of appellant.

 Even the state's psychologist, Dr. Price, appeared to be uncertain as to appellant's mental abilities. 
He did not testify that appellant is not mentally retarded but rather that his "review of this case does not
clearly indicate that [appellant] is mentally retarded," and he conceded that appellant's intelligence "fell
either in the borderline range of intellectual functioning (IQ = 70-84) or in the upper end of mild mental
retardation (IQ =50-55 to 70)." Our definition of mental retardation encompasses parts of both ranges. 
Dr. Price also stated that "[t]here is no doubt that Mr. Hall has low intelligence and poor academic abilities
. . .."

 The state argues that appellant's assignment to special education classes was based on "learning
disabilities," a claim that is refuted by school records that indicate that the school wished to designate him
as mentally retarded, but did not do so at his mother's request. The state conceded in its answer to
appellant's application for writ that appellant had passed the written portion of the driving license
examination only after his mother worked with him for three days. (7) The state further urged that the trial
court should entirely ignore the testimony of Dr. Church because, although having appropriate credentials,
she was licensed as a psychologist only in Oklahoma. 

 I am loathe to find that appellant is not mentally retarded when that finding is based largely on the
lay opinions of a store supervisor, a waitress, a bag boy, and five prison guards, and the expert opinion of
a psychologist who could not reach a definite conclusion, especially when all had limited contact with
appellant. I am unpersuaded that bragging or using big words and claiming to read classic literature
establishes that appellant is not retarded. If appellant is, in fact, retarded, his statements may establish only
that he, like many retarded persons, wishes to be regarded as "normal" and "smart" and that he will behave
in ways that he thinks will cause others to regard him as such, just as persons with normal intelligence will
behave in ways that are perceived as producing acceptance. As Dr. Church noted in her affidavit, appellant
"had difficulty with the requirements of doing the work of a 'stocker' and was demoted to bagging
groceries." She also stated, "His main motivation is not to appear to be a 'dummy' in order to mask his
deficits. He tends to say what he has heard others say and/or to say what he thinks others expect him to
say. This is not at all unusual as a coping mechanism for the mentally retarded population."

 Nor are persons with limited mental abilities immune from other human foibles, such as lying. A
well-drafted motion may be the product of a skilled jailhouse writ writer. Persons with limited mental
ability often do extremely well in structured environments, and I cannot think of a more structured
environment than death row. 

 It may very well be that a full hearing on appellant's claim of mental retardation, with the
opportunity to cross-examine witnesses and argue the significance of their testimony, would establish that
appellant is not retarded. However, we will never know unless we order that full hearing and have before
us both the tested testimony of persons who are knowledgeable in the mental-health field and relevant lay
testimony about his adaptive behavior. 

 I respectfully dissent. 

 Johnson, J. 

Date Filed: May 5, 2004

En banc 

Publish 

1. Q: Okay. Now, one other thing I wanted to ask you about. On the assessment that

 was done during the testing, it says, - and maybe you can interpret this for me, - "The student's adaptive behavior
was assessed using informal measures. Results showed that the student's level of intellectual functioning is
consistent with his or her adaptive behavior, with no significant deficits in either area."

 Do you know what they meant by that?

 A: Yes, I do.

 Q: Okay, do you agree with it? 

 A: No.

 Q: Okay. Do you know who prepared that report?

 A: I believe the last one was prepared by Linda Akin.

 Q: Who? I'm sorry.

 A: Linda Akin.

 Q: Okay. And is she with the school district?

 A: Yes, she is. 

2. http://www.cdc.gov/ncbdd/dd/ddmr.htm.
3. Such causes include: an error in number of chromosomes (Down's syndrome ), defects in chromosomes
(fragile X, Angelman and Prader-Willi syndromes), missing chromosomes (Cri-du-chat syndrome), mis-located
chromosomes, metabolic disorders (phenylketonuria), maternal disease or drug use (rubella, fetal alcohol syndrome,
cocaine or amphetamine abuse), maternal malnutrition, and physical abnormalities (hydrocephalus). 
4. Such causes include: HIV, asphyxia, and birth trauma.
5. Such causes include: head injury, stroke, meningitis, lead poisoning, malnutrition, very high bilirubin
levels, and abuse such as shaking.
6. http://www.nlm.nih.gov/medlineplus/ency/article/001523/htm.
7. In his affidavit, Dr. Denkowski attests that appellant passed on the third try but was never able to pass the
driving test.