IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. WR-48,957-02






EX PARTE JAIME ELIZALDE, JR., Applicant








ON APPLICATION FOR A WRIT OF HABEAS CORPUS


FROM HARRIS COUNTY






 Johnson, J. concurs in the denial of relief, joined by Hervey, Holcomb, and
Cochran, JJ.


C O N C U R R I N G S T A T E M E N T 



 After a jury found applicant guilty of capital murder and answered the special issues
submitted pursuant to Tex. Code Crim. Proc. art. 37.071, the trial court assessed punishment at
death. This Court affirmed applicant's conviction on direct appeal. Elizalde v. State, No. 72,813
(Tex. Crim. App. June 19, 1999).

 Applicant filed his original application for writ of habeas corpus on March 29, 2001. The
Court denied that application on April 11, 2001. On January 18, 2006, applicant filed a second
application for writ of habeas corpus that alleged that he is mentally retarded and therefore may not
be executed. Atkins v. Virginia, 536 U.S. 304 (2002). Applicant's original execution date was set
for November 2, 2005, but on October 31, 2005, the trial court entered an order, at the state's
request, to modify applicant's execution date and reschedule it for January 31, 2006. In the weeks
immediately preceding the original execution date, applicant signed a purportedly inculpatory
affidavit that made him a material witness/suspect in another case, and he also raised the issue of his
mental retardation for the first time.

 In Atkins, the United States Supreme Court noted that "any serious disagreement about the
execution of mentally retarded offenders . . . is in determining which offenders are in fact retarded."
Atkins, 536 U.S. at 317. The Supreme Court, however, left it to the states to develop appropriate
enforcement mechanisms to prevent the execution of such individuals. Id. As with any other claim
for habeas corpus relief, applicant bears the burden of proving that he is mentally retarded. Ex parte
Chappell, 959 S.W.2d 627, 628 (Tex. Crim. App. 1998). 

 A person is considered mentally retarded under Texas law if he is able to demonstrate that
he meets the three prongs of the test cited in Briseno: (1) (1) "significantly subaverage general
intellectual functioning" (generally, an IQ of 70 or below); (2) "related limitations in adaptive
functioning;" and (3) onset of the first two characteristics before age eighteen. Ex parte Briseno, 135
S.W.3d 1, 7-8 (Tex. Crim. App. 2004); see also Hall v. State, 160 S.W.3d 24, 36 (Tex. Crim. App.
2004). Mental retardation is similarly defined under Tex. Health & Safety Code § 591.003(13).

 Applicant has provided minimal evidence in support of his mental-retardation claim. The
only evidence he has presented comes in the form of prison and academic records. In particular,
records from the Texas Department of Criminal Justice (TDCJ) indicate that applicant took at least
two IQ tests. The first test, the Revised Beta II (a brief screening test) was administered to applicant
upon his incarceration at age 18. Applicant scored 60 on the examination, below the presumptively
retarded score of 70. Shortly thereafter, prison officials administered the Fair Culture IQ Test, upon
which applicant scored 96. In making his mental-retardation claim, applicant also relies on TDCJ
disciplinary records, which assess his IQ at 60 and, based on tests of educational achievement, 
estimate his level of intellectual functioning as being consistent with that of a fourth grader.

 Applicant also argues that his poor academic performance, which led him to drop out of
school before completing the eighth grade, is consistent with characteristics of a mentally retarded
individual. Specifically, applicant uses academic records to demonstrate that he had limited
academic success and that he failed the seventh grade three times. This information alone, however,
does not prove that applicant is mentally retarded. 

 His poor performance in school was attributed by his mother to many absences because of
asthma. Applicant worked in the family wrecker business and as a welder. He was married and
supported his wife and two children. The state points out that applicant was never diagnosed as
being mentally retarded and suggests that applicant's low score on the Beta II is the result of
applicant's lack of motivation, poor academic record, or cultural biases. 

 I believe that applicant has failed to make a prima facie showing that his intellectual
functioning is significantly sub-average.

 The second prong of a mental-retardation claim requires analysis of applicant's adaptive-
behavior skills. Adaptive behavior refers to "the effectiveness with or degree to which a person
meets the standards of personal independence and social responsibility expected of the person's age
and cultural group." Tex. Health & Safety Code § 591.003(1). Some persons whose IQs fall
within the accepted range of mental retardation are still able to function quite well in society, while
others, whose IQs are presumptively not within the range of mental retardation, have maladaptive
behaviors to an extent that renders them unable to care for themselves adequately. In Briseno, this
Court examined seven factors to gauge the level of an individual's adaptive functioning. (2) 

 However, applicant provides no evidence in the form of medical records, affidavits, or expert
testimony to address any of the factors outlined in Briseno. The state, on the other hand, notes that
applicant's mother testified at the punishment phase of trial and indicated that applicant was "very
active," "well-liked," and "normal" as a child and that he "never had to go the principal's office." 
The state also presented evidence at trial that applicant was capable of formulating and executing
plans for both present and future activities and that applicant was married, employed, and supporting
his wife and children. The state places significant emphasis on applicant's actions on the evening
of the murder and during his stay in prison. The state also suggests that applicant planned the
murders with the help of his father and that he devised a scheme to lure the victims out of the bar
before shooting them in the parking lot. There was testimony at trial that applicant had been
involved in more than one assault while in custody.

 Once incarcerated, applicant demonstrated leadership among other inmates by serving as a
lieutenant in the Mexican Mafia, the largest prison gang organization. Applicant's sister testified
that applicant made an effort to teach middle-school students about the benefits of an education. 
She testified at trial that applicant is an avid reader who uses the prison law library to advance his
own case and cases of fellow inmates. She also indicated that applicant dreamed of becoming a
paralegal and working for her in her future law practice. This evidence indicates that applicant has
failed to make a prima facie showing that he possesses the requisite limitations in adaptive
functioning.

 Finally, applicant provides no evidence that demonstrates that the characteristics that are
typical of mental retardation, as discussed in Atkins and Briseno, had manifested themselves before
applicant turned eighteen. The only IQ tests he has presented were administered to him after he
turned eighteen. The testimony of those closest to him in his developing years, his mother and sister,
made no mention of being mentally retarded or even "slow." Rather, he was described as normal,
but in with the wrong crowd.

 Applicant's case is distinguishable from Atkins. Atkins was convicted on charges of
abduction, armed robbery, and capital murder. Atkins, 536 U.S. at 308. The defense relied heavily
on one witness, a forensic psychologist who had evaluated the defendant before trial and testified
at trial that the defendant had an IQ of 59 and was therefore "mildly mentally retarded." Id. at 308-09. The witness's conclusion was based on interviews with the defendant and people who knew
him, a review of school, court, and police records, and the administration of a standard intelligence
test. At sentencing, the forensic psychologist reiterated his findings and pointed out that defendant's
limited intellect was a "consistent feature throughout his life, and that his IQ score of 59 is not an
aberration . . .." Id. at 309.

 Unlike the defendant in Atkins, applicant's alleged mental retardation was not a "consistent
feature" throughout his life; applicant's claim of mental retardation was not raised until after he was
sentenced to death. Moreover, applicant has provided no evidence that he possesses limitations in
adaptive functioning or that the alleged mental retardation manifested itself during his developmental
stages of growth.

 It is noteworthy that applicant appears to be attempting to manipulate the legal system in
order to delay his execution. In his sole ground for habeas corpus relief in this subsequent
application, applicant contends that he is mentally retarded and, therefore, may not be executed. The
trial court, on October 31, 2005, rescheduled applicant's November 2, 2005, execution date in the
interest of justice so that applicant would have ample time to collect evidence and to petition the trial
court for funds necessary to hire an expert to support his mental-retardation claim. Instead, applicant
took no action for almost three months, even though he was aware that his execution had been
rescheduled for January 31, 2006. Now, with only a few days remaining before his scheduled
execution, applicant is petitioning this Court for more time to substantiate his mental-retardation
claims. 

 Moreover, applicant's instant application for writ of habeas corpus is dated October 26, 2005,
seven days before the original execution date. Surely, applicant could have and should have filed
his application to this Court at a much earlier date. The date on the instant application for writ of
habeas corpus suggests that applicant intended to file a similar claim immediately before the original
execution date, but chose not to do so when the trial court modified that date for other reasons. Applicant has not made a prima facie showing that he falls within the parameters of mental
retardation. I, therefore, concur in the denial of relief.


 Johnson, J.


Filed: January 30, 2006

Do not publish

 

1. "This Court has previously employed the definitions of 'mental retardation' set out by the American
Association on Mental Retardation (AAMR), and that contained in section 591.003(13) of the Texas Health and
Safety Code." Briseno, at 7.
2. The Briseno Court weighed the following factors as indicative of mental retardation: (1) did those who
knew the person best during the developmental stage, his family, friends, teachers, employers, authorities, think he
was mentally retarded at that time, and if so, act in accordance with that determination; (2) has the person formulated
plans and carried them through, or is his conduct impulsive; (3) does his conduct show leadership, or does it show
that he is led around by others; (4) is his conduct in response to external stimuli rational and appropriate, regardless
of whether it is socially acceptable; (5) does he respond coherently, rationally, and on point to oral or written
questions, or do his responses wander from subject to subject; (6) can the person hide facts or lie effectively in his
own or others' interests; and (7) putting aside any heinousness or gruesomeness surrounding the capital offense, did
the commission of that offense require forethought, planning, and complex execution of purpose? Briseno, at 8-9.