GRAVES, Presiding Justice,
Dissenting to Part Two:
II. WHETHER THE DECISION IN ATKINS v. VIRGINIA REQUIRES THAT THE DEATH SENTENCE IN THIS CASE BE SET ASIDE.
¶ 88. The majority of this Court relies on an incomplete and admittedly partially inaccurate report from the State Hospital at Whitfield (the Whitfield Report) to find that Anthony Doss is not mentally retard *724 ed pursuant to Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).[18] Because I would find that the evidence in this case clearly requires a finding that Doss is mentally retarded, I respectfully dissent.
¶ 89. The majority acknowledges in footnote 6 that it is “speaking in terms of the report’s contents,” despite testimony offered to correct, clarify and complete the report. Further, this report clearly states that it was written without the experts being able to contact numerous people and without benefit of substantial, relevant information. The report says: “[Hjowever, these attempts were unsuccessful at the time this report was written. Although we requested more complete school records for Mr. Doss, the psychological testing report and raw data from North Mississippi Medical Center, and the raw data from a prior psychological evaluation by Dr. Gel-bort, we had not received those records at the time this report was written.” The report later says: “However, this opinion is limited by a lack of available records related to Mr. Doss’ school history and other prior intellectual assessments, as well as obstacles encountered when attempting to assess adaptive functioning in individuals who have been on death row for an extended period of time.” I write separately because I submit that an analysis of the entire record and applicable law is necessary to decide this issue.
¶ 90. In Chase v. State, 873 So.2d 1013 (Miss.2004), this Court clarified the application of Atkins in the trial courts as follows:
The Atkins majority cited, with approval, two specific, almost identical, definitions of “mental retardation.” The first was provided by the American Association on Mental Retardation (AAMR):
Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.
Atkins, 536 U.S. at 308 n. 3, 122 S.Ct. 2242, citing Mental Retardation: Definition, Classification, and Systems of Support 5 (9th ed.1992). The second was provided by The American Psychiatric Association:
The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, soeial/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system. Diagnostic and Statistical Manual of Mental Disorders 39 (4th ed.2000).

Id.

*725 The Diagnostic and Statistical Manual of Mental Disorders, from which the American Psychiatric Association definition is quoted, further states that “mild” mental retardation is typically used to describe persons with an IQ level of 50-55 to approximately 70. Id. at 42-43. The Manual further provides, however, that mental retardation may, under certain conditions, be present in an individual with an IQ of up to 75. [n. 18] Id. at 40. Additionally, according to the Atkins majority, “it is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition.” Id. citing 2 Kaplan & Sadock’s Comprehensive Textbook of Psychiatry 2952 (B. Sadock & V. Sadock eds 7th ed.2000) (emphasis added).
n. 18 This point is conceded by the State. However, IQ, alone, does not determine mental retardation. According to the DSM-IV, it is possible to diagnose Mental Retardation in individuals with IQ’s between 70 and 75 who exhibit significant deficits in adaptive behavior. Conversely, Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning.
These definitions were previously adopted and approved by this Court in Foster v. State, 848 So.2d 172 (Miss.2003). This Court further held in Foster that the Minnesota Multiphasic Personality Inventory-II (MMPI-II) is to be administered since its associated validity scales make the test best suited to detect malingering.... Foster must prove that he meets the applicable standard by a preponderance of the evidence.... This issue will be considered and decided by the circuit court without a jury. Id. at 175, 122 S.Ct. 2242.
These definitions, approved in Atkins, and adopted in Foster, together with the MMPI-II, [n. 19] provide a clear standard to be used in this State by our trial courts in determining whether, for Eighth Amendment purposes, a criminal defendant is mentally retarded. The trial judge will make such determination, by a preponderance of the evidence, after receiving evidence presented by the defendant and the State,
n. 19 Although this Court has identified the MMPI-II as a test that should be given, we now clarify our position by stating that the expert should use the MMPI-II, and/or any other tests and procedures permitted under the Mississippi Rules of Evidence, and deemed necessary to assist the expert and the trial court in forming an opinion as to whether the defendant is malingering.

Procedure to be used.

Having established the definition of mental retardation to be used for purposes of Eighth Amendment protection to mentally retarded defendants, we now turn to the procedure to be used in reaching a determination of mental retardation.
We hold that no defendant may be adjudged mentally retarded for purposes of the Eighth Amendment, unless such defendant produces, at a minimum, an expert who expresses an opinion, to a reasonable degree of certainty, that:
1. The defendant is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or The American Psychiatric Association;
2. The defendant has completed the Minnesota Multi phasic Personali *726 ty Inventory-II (MMPI-II) and/or other similar tests, and the defendant is not malingering.
Such expert must be a licensed psychologist or psychiatrist, qualified as an expert in the field of assessing mental retardation, and further qualified as an expert in the administration and interpretation of tests, and in the evaluation of persons, for purposes of determining mental retardation.
Upon meeting this initial requirement to go forward, the defendant may present such other opinions and evidence as the trial court may allow pursuant to the Mississippi Rules of Evidence.
Thereafter, the State may offer evidence, and the matter should proceed as other evidentiary hearings on motions.
At the conclusion of the hearing, the trial court must determine whether the defendant has established, by a preponderance of the evidence, that the defendant is mentally retarded. The factors to be considered by the trial court are the expert opinions offered by the parties, and other evidence if limitations, or lack thereof, in the adaptive skill areas listed in the definitions of mental retardation approved in Atkins, and discussed above. Upon making such determination, the trial court shall place in the record its finding and the factual basis therefor.
Chase v. State, 873 So.2d at 1027-29.
¶ 91. Doss underwent a psychological evaluation at the University of Mississippi in 1988 pursuant to a youth-court proceeding. Despite the majority’s assertion that “Doss had at least two prior psychological evaluations at the age of fifteen, neither of which resulted in a diagnosis of mental retardation,” the record indicates that Doss was “to be evaluated for possible drug problems which may be contributing to his behavior” and not for the purpose of determining if he was mentally retarded pursuant to Atkins. More significantly, despite the majority’s statement that “[tjhese evaluations found that Doss did not demonstrate deficits consistent with mental retardation ...,” there was absolutely no finding that Doss is not mentally retarded pursuant to Atkins. Notwithstanding the purpose for which Doss was evaluated, the report from this evaluation indicated as follows: 1) On the Wide Range Achievement Tesb-Revised (WRAT-R), Doss achieved a sixth-grade level in Arithmetic and below a third-grade level in reading and spelling; 2) on the Wechsler Intelligence Scale for Children-Revised (WISC-R), Doss obtained a verbal scale IQ of 67, placing him in a mentally deficient intelligence classification, a performance scale of 80, placing him in a low-average intelligence classification, and a full scale of 71, placing him in a borderline classification of intelligence; 3) “The Bender Motor Gestalt Motor Test revealed that there may be some organic basis to Anthony’s difficulties,” as Doss showed poor planning, perceptual difficulties, inattentiveness and a hurried approach to tasks; 4) the Millón Adolescent Personality Inventory (MAPI) revealed “no unusual test-taking attitudes that may have distorted the MAPI results.”[19]
*727 ¶ 92. In 2001, Dr. James Merikangas executed an affidavit, which was attached to Doss’ application for leave filed with this Court, outlining the need for a neu-ropsychiatric evaluation on Doss and opining that the University of Mississippi report from 1988 suggests organic brain damage and mental retardation. Doss also attached the affidavit of Jeffrey Eno, a clinical and forensic social worker, to his application for leave. Eno provided a life history of Doss, including prenatal history, exposure to lead paint chips, details of his violent, abusive upbringing in a dangerous area, physical injuries, substance abuse, and history of mental issues within the family.
¶ 93. In 2003, Dr. Michael Gelbort performed a neuropsychological evaluation of Doss at Parchman, during which the following tests were administered: Wechsler Adult Intelligence Scale-Ill, Wechsler Memory Scale-Ill subtests, Wide Range Achievement Test-Ill, Lateral Dominance Examination, Strength of Grip, Trail Making Test, Category Test, items from the Luria Nebraska, and diagnostic interview with mental status testing. Gelbort’s report, which was attached as an exhibit to his application for leave, indicated as follows:
Intellectual testing found Verbal, Performance, and Full Scale IQ scores of 68, 79, and 71, respectively. These scores are virtually identical to those obtained in the distant past and lend weight to the opinion that the patient put forth appropriate effort, as well as that his intellectual functioning is in the borderline mentally retarded range and that he qualifies, in terms of intellectual impairment, for a diagnosis of Mental Retardation.
Exhibit HH, Application for Leave to File Motion to Vacate Judgment and Sentence, 1999-DR-296 (May 20, 2003). Gelbort’s impressions were:
Consistent with the past test results, Mr. Doss presents with a Full Scale IQ score between the second and third percentile qualifying him for a diagnosis of Mental Retardation. A clinical social worker is collecting information about Mr. Doss and investigating the other issues involved in making a definitive diagnosis. In any event, the patient is showing clear and consistent impairments in frontal lobe functioning and bilateral temporal lobe functioning with notable impairments in reasoning, judgment, problem solving, and all types of new learning and memory skills. Based on the current evaluation and historical information reviewed, Mr. Doss does qualify and is diagnosed with Organic Brain Dysfunction, also diagnosed as Cognitive Disorder NOS based upon other nosological systems. The data and historical information reflect that these deficits are likely both congenital and acquired at an early age, predate the event for which he was tried and convicted, and were as readily and easily observed and diagnosed at the time of his original trial as they are at this point in time. They have a significant impact and effect on his behavior with the patient having impairments in the abilities of problem solving and reasoning, as well as anticipating the consequences of his behavior and planning adaptively and effectively into the future because of his neuroeognitive impairments.
Exhibit HH, Application for Leave to File Motion to Vacate Judgment and Sentence, 1999-DR-296 (May 20, 2003).
¶ 94. While acknowledging the State’s questions concerning Doss’ claims, this Court granted Doss leave to present his *728 Atkins claim before the trial court. The trial court appointed the Mississippi State Hospital to make a determination of whether Doss is mentally retarded. Doss was examined by Drs. Gilbert MacVaugh III, Criss Lott, John Montgomery, and Reb McMichael in November 2005. At the evidentiary hearing, Doss called Dr. Lott, who was contracted by the Mississippi State Hospital to assist in the evaluation of Doss, Dr. Daniel Grant, and Dr. Timothy Summers as witnesses. The State called Drs. MacVaugh and McMichael, employees of the Mississippi State Hospital, as witnesses.
¶ 95. Doss was administered the Stanford Binet Fifth Edition test by Grant on May 5-6, 2005. Doss’ full-scale IQ score was 62. Doss was administered the Weeh-sler Adult Intelligence Scale-Ill (WAIS-III) during the evaluation at the Mississippi State Hospital (Whitfield) on November 2, 2005. Doss received a corrected full-scale IQ score of 70 on the WAIS-III, which is a standardized test of adult intelligence.
¶ 96. Experts for both the State and the defendant agree that Doss meets the first criterion of significantly subaverage intellectual functioning manifested before age eighteen.[20] Lott testified repeatedly that he agreed that the testing of Doss meets the first criterion, that Doss has significantly subaverage intellectual functioning that was manifested before age eighteen. Lott also testified that Doss had scored low consistently over the years with the exception of the estimated IQ in 1988, which Lott acknowledged was not a true result. See supra note 3. MacVaugh testified, in relevant part: “The, the range of scores on IQ test for mild mental retardation is approximately 70 to 50 to 55. So I think that is the range that we are talking about here in Mr. Doss’ case.” MacVaugh also testified that Doss meets the intellectual-impairment prong of Atkins. “But in a forensic context, particularly this case, with the criteria set forth by Chase and Atkins, I think he does satisfy the cognitive or intellectual impairment prong of Atkins. So I don’t — I think he does have mild mental retardation in terms of the intellectual impairment prong of the diagnosis.”
¶ 97. As Doss meets the first prong of significantly subaverage intellectual functioning manifested before age eighteen, the relevant issue is then whether Doss has related or significant deficits in adaptive functioning. Adaptive-skill areas are communication, self-care, functional academics, community use, self-direction, health and safety, leisure, and work. The record indicates that Doss does have related or significant deficits in adaptive functioning.[21]
*729 ¶ 98. Grant administered a standardized test to assist in a determination of Doss’ adaptive-skills functioning. Grant testified:
Q. Okay. Okay. The — in terms of adaptive functioning what are your conclusions about, about that issue?
A. I feel that he has deficits at adaptive functioning.
Q. Okay. In what areas?
A. I looked at it from two different points of view. I looked at it from the skills he has on the language area, his language skills are — showed significant deficits. And his academic skills showed significant deficits. And those two areas would fit within — would show — one way of showing that he met poor adaptive behavior. As they said, two sets of deviations below the means in those two areas.
And I also administered the adaptive — the independent living skills. And the norms for that test for this group is — the means score is — the mean age score is 34, which is what his age is. So I mean he had a score of — a full scale score of 65.
Q. Okay.
A. And if you notice, he had some, some better scores, some lower scores. And retarded individuals are no different than the rest of us. They have strengths. They have weaknesses. And he had some strengths and some weaknesses in different variables.
Q. In the full scale standard score of 65, why does that lead you to conclude he has got deficits in adaptive functioning?
A. Because it’s more than two sets of deviations below the mean. It also is consistent — these scores are consistent across all these variables. Almost every test I gave him was within a few points of that score.
Q. The number 65 here, is that on the adaptive — the independent living scales test or the equivalent of 65 on an IQ test?
A. Right. With 100 being average.
¶ 99. Grant further testified that Doss also had exhibited significant deficits with regard to functional academics, work, and communication. Moreover, Grant concluded that Doss suffered from organic brain dysfunction, which could have been impacted by the head injuries. Grant testified:
Impaired brain. He has problems with attention, problems with concentration. He has nystagmus, moving of the eyes. He has a thin lip, peculiarity of the nose, which is typical in people that have fetal alcohol syndrome. He has — he has concrete thinking. He has problems with memory, problems with — his reasoning was concrete.
¶ 100. Summers also testified that Doss has significant deficits in adaptive functioning. Specifically, Summers said:
Well, in my opinion, first of all, if you look at communication issues for one, he certainly has adaptive deficits in communication primarily because number one, he is inattentive. Number two, he is impulsive. Number three, he is mistrustful. Number four, he has difficulty processing. Number five, his general fund of knowledge is poor. Number six, he has difficulty with abstract thinking. Number seven, his memory is poor, particularly his working memory.
If you gave him a problem that involved his remembering a certain amount, amount of information that he could later on use to render a decision, he wasn’t able to do that. And his, his general — and then he would rush into solutions very fast without really giving a lot of thought to it. So he was — he *730 was very difficult for me to understand him.
And so finally I had to just finally say wait a minute. Okay. This is what we are here for. This is what I want you to focus on. This is what we are going to talk about. And so he has significant problems as it relates to communication. He thinks nobody loves him. He thinks nobody cares about him. He thinks that—
¶ 101. Summers also testified that Doss had significant deficits in academic functioning, abstract reasoning, social skills, and interpersonal relations, and that these deficiencies were related to his subaverage intellectual functioning.
Q. Let me ask you this. Do the — you mentioned in your report some areas of limitations and adaptive functioning. Do you, you believe those stem from and are related to the subaverage intellectual functioning that was already discussed?
A. Absolutely. I mean — see, it doesn’t matter if your intellectual functioning is low because you have head trauma or toxicity to your brain or if your intellectual functioning is low because you lived in an impoverished environment. The end result is still the same.
But in my opinion, you know, Anthony has had so much, so many problems, so many issues to his brain. I mean he has had — I mean number one, he started out with a mom who was drinking every day. Then number two, she was kicked in the abdomen when she was pregnant to the point that she bled so much that she had to go to the hospital.
Number three, when Anthony was a little boy then he had lead toxicity. Then after that he had measles at two. And then after that he developed multiple head trauma — baseball bats, sticks, hit in the head with a pistol.
So, you know, when you get through looking at all those different issues then — now, in addition to that, you also have the psycho-social issues that affect the brain.
¶ 102. Lott testified that he did not use a standardized test to measure adaptive functioning, but that he reviewed Grant’s report, which was based on a standardized test. Lott further testified that it is very hard to assess what someone’s adaptive functioning was twenty years ago. Lott discounted the use of the standardized test because he said there have been no studies that norm the test for people on death row.
¶ 103. Most significantly, Lott testified that he relies on the tenth edition of the AAMR definition, but not in this case.
Q. I want to show you the book, 10th edition of the book called Mental Retardation, Definition, Classification, Assistance and Support by the American Association of Mental Retardation. Are you familiar with this book?
A. Yes.
Q. Okay. Is it a book that you rely on?
A. Yes.
Q. Okay. I want to show you a page, eight, it’s called Assumption 1 and just a couple of sentences. And I want to ask you about it. Limitations in present functioning must be considered within the context of community environments typical of the individual’s age, peers and culture. This means the standards against which the individual’s functioning must be measured are typically community-based environments, not environments that are isolated or segregated by ability.
Doesn’t that suggest that it is unnecessary to norm a test for someone in an environment that is isolated or segregated like a prison?
*731 A. Well, you would norm it. When you say it’s unnecessary to norm it, I am not sure what you mean by not needed. We, we, we certainly rely on norms. That is the way we interpret measures. It would not be appropriate for us to use any test that had not been adequately normed.
Q. Right.
A. So I’m not sure exactly where you are going with that question.
Q. In your report, at the bottom of Page 31, the very last paragraph, you, you, you say that there is standardized assessment interests — assessment instruments for measuring adaptive functioning. And then you go on to say such instruments have not been standardized for use with offenders who have been incarcerated for a number of years, particularly those on death row. Then you go on to say that administration of a standardized instrument to measure adaptive skills with a death row inmate would yield invalid results.
But given what the — what the AAMR says about the need to measure someone in terms of the community at-large rather than segregated or isolated environment, can’t a test like this yield valid results even though it has not been standardized for use with people on death row?
A. It would certainly be possible if you had adequate measures here and adequate population for us to look at. It is very difficult, I think, to take a test like this and to go into death row and ask someone there questions about a defendant’s behavior. And they, they don’t have access. They have limited access on death row to these kinds of activities and behaviors.
Are we assessing at 20? Are we assessing their deficits prior to the age of 18? I think that is the issue here. What do they look like prior to 18? That’s, that’s the criteria. They have to meet this deficit — these deficit areas pri- or to the age of 18. Now, it still remains difficult. I think it is questionable as to whether or not we can do that and how adequately and correctly we can do that.
[[Image here]]
Q. But the fact that — I mean the fact that it was not normed on the people on death row is not by itself important given the fact that it has been normed with the general population, which is what the AAMR says is important; is that correct?
A. I think you are correct in that a test can be appropriate. For instance, the IQ test that we all use, it wasn’t normed on death row inmates and we use that routinely. It’s though how adequate that measure is in collecting or obtaining information that you are looking for. An IQ test that we use for the inmates on death row is the same IQ test I use in disability evaluations every day. There is not a specific set of norms for those IQ, IQ results that I get just for death row inmates.
Q. Okay.
A. Okay. I understand that, and I agree with you. The problem though is getting reliable data....
There are a number of tests that we would use that have been normed elsewhere that aren’t normed for death row inmates, a number of them. It is just taking that data that we obtained for this instrument and then interpreting it. I think that remains a big problem in this area.
¶ 104. Lott acknowledged that Doss’ history is significant for several risk factors that are correlated with the development of mental retardation, including *732 childhood abuse; abuse of the mother during pregnancy; social and cultural deprivation during infancy, childhood, and into adolescence; the ingestion of lead paint; neglect; possible malnutrition; head injuries; and limitations in functional academics. However, Lott dismissed these factors as not related to Doss’ mental retardation.
Q. Now, you said that on the surface Mr. Doss’s history might seem to suggest he has demonstrated limitations in some areas of adaptive skills in the community, i.e., functional academics, work, self direction, health and safety. Now, if these things were not related to mental retardation, what were they caused by?
A. By growing up in an environment where one isn’t supervised, one isn’t monitored, one isn’t nurtured, a lot of neglect and possible abuse.
¶ 105. Lott acknowledged that limitations in these adaptive skills, even in a person who is not mentally retarded, substantially impact a person and can affect judgment. Lott testified that most of the basis for finding that Doss was not retarded came from unverified or unexplained information provided by Doss. Lott said that some of the information was “corroborated in part by family about his ability to maintain independent or close to independent living, developmentally speaking, early on.” Lott specifically mentioned Doss helping his mother when he was eight or nine years old. Sadie also testified that Doss and his brother had helped her. However, the record does not establish that Doss did anything substantial to help his mother or anything that would establish that he had no deficiencies in adaptive skills before age eighteen.
¶ 106. MacVaugh’s testimony was similar to Lott’s. MacVaugh dismissed Doss’ deficits in the adaptive areas of functional academics and work because “we had enough data to suggest that his apparent deficits in those areas were due to his personality attributes, his various behavioral problems, substance abuse and other factors that together we would consider maladaptive behavior, not adaptive deficit the way a mental retardation diagnosis requires....” MacVaugh also discussed Doss’ apparent ability to work as a drug dealer. However, testimony at trial established that Doss was merely following instructions of others and was often assisted by his brother. MacVaugh also offered the following testimony on the confusion regarding the relationship of adaptive deficits to the significant intellectual impairment:
Sure. We as clinicians, think, or at least on our service, maybe I shouldn’t speak for my colleagues and should limit this to my own opinion about this, really interpret the definition of mental retardation that consists of the two prongs of intellectual impairment and adaptive functioning impairment as being more than just coexisting. I mean there has to be some relationship between those domains of impairment.
And really the, the view that we have taken in this in order to help us understand this better because it is so difficult to assess, particularly someone who has a history like Mr. Doss, who on the surface may look like they have some of these adaptive deficits but with further analysis there are reasons why that might better explain why they look that way historically.
The issue is whether or not these deficits in adaptive functioning are due to the significantly subaverage intellectual functioning. This is an issue that is very controversial. It has not been explicitly clear in any of the major docu *733 ments that we rely on in doing our evaluations....
There is no national consensus about what the interpretation is about that, what the approach is to the assessment on that point and that evaluators do lots of different things. It is very variable in terms of how you are approaching the issue. Are the deficits supposed to be due to the intellectual deficits, or do they just somehow coexist?
My own view on that is the reason why it is not clear in the AAMR definition or DSM definition is because when these definitions were written, it was impossible to anticipate that these definitions would be under the microscope in a death penalty case one day because these were written ^¡re-Atkins so there was no reason to make that explicitly clear that the intellectual deficits are more than related to the adaptive deficits, that the adaptive deficits should be due to the intellectual deficits.
For example, if somebody is leaving the stove on is it because they have such a severe memory impairment because they forgot to turn it off? Now, that is an example of self-care adaptive deficit that is due to a significant intellectual deficit. Whereas if somebody has an intellectual deficit but, you know, doesn’t show some related adaptive deficits related to the intellectual impairments then I question whether that is actually adaptive functioning deficits.
¶ 107. The testimony of both Lott and MacVaugh was similar to the Whitfield report, which said, in part:
On the surface, Mr. Doss’ history might seem to suggest that he has demonstrated limitations in some areas of adaptive skills in the community (i.e., functional academics, work, self-direction, health, and safety). However, it is our opinion that these apparent difficulties may be better explained by his history of neglect, abuse and maladaptive behaviors, since they did not appear to stem from severe intellectual deficits.
¶ 108. The Whitfield report also said:
It is noted that Mr. Doss [sic] history is significant for several risk factors that are correlated with the development of mental retardation. For example, during her pregnancy with Mr. Doss, Ms. Doss reportedly abused alcohol regularly, was prescribed valium (anti-anxiety medication), was “kicked” in the stomach ... leading to blood loss and hospital attention, and reportedly contracted a venereal disease during pregnancy. Mr. Doss also reportedly tested positive for lead poisoning due to exposure to chipping paint as a child. Moreover, Mr. Doss reported (and medical records confirm) that he also has had multiple head injuries over the years.
¶ 109. The report then discounts these risk factors for mental retardation based on the prior psychological evaluations at the age of fifteen and on a ninth-grade class ranking. However, the report previously acknowledged that Doss had scored in the borderline mentally retarded range as an adolescent. Further, as stated previously herein, Doss was never evaluated as an adolescent for the purpose of determining whether he was mentally retarded pursuant to Atkins. Moreover, while Doss was ranked 681 out of 850 students, the report also acknowledges that Doss passed only one out of five subjects that year, while failing the others.[22]
*734 ¶ 110. The Whitfield report further said that despite Doss’ IQ, his “apparent difficulties [in adaptive skills] may be better explained by his history of neglect, abuse, and maladaptive behaviors, since they did not appear to stem from severe intellectual deficits.” (Emphasis added.) The report also said that “there were no data that suggested Mr. Doss has ever demonstrated significant deficits in adaptive functioning due to the effects of subaverage intellectual functioning.” [23] (Emphasis added.) However, there is no requirement in the definitions set out previously herein that the deficits in adaptive functioning must be “due to the effects of subaverage intellectual functioning,” much less that the adaptive deficits “stem from severe intellectual deficits.”
¶ 111. The AAMR definition for mental retardation, as set out previously herein, states “significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more” adaptive-skill areas. Atkins, 536 U.S. at 308, 122 S.Ct. 2242. The American Psychiatric Association’s definition, also set out previously herein, states “significantly subaverage general intellectual functioning ... that is accompanied by significant limitations in adaptive functioning in at least two” of the skill areas. Id. Also, as noted previously, according to the Diagnostic and Statistical Manual of Mental Disorders, “it is possible to diagnose Mental Retardation in individuals with IQ’s between 70 and 75 who exhibit significant deficits in adaptive behavior. Conversely, Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning.”
¶ 112. In Rivera v. Quarterman, 505 F.3d 349 (5th Cir.2007), the Fifth Circuit Court of Appeals upheld the federal district court’s finding regarding related limitations in adaptive functioning despite the State’s argument that Rivera’s adaptive deficits may have been attributable to his abuse of inhalants and not to his mental retardation. In noting that the district court had acknowledged that Rivera’s adaptive deficits were just as likely to have been caused by his long-term drug abuse as his diminished intellectual capacity, the Fifth Circuit Court said:
We read this quote charitably, in support of the district court’s own ruling. The district court was likely distinguishing only between etiologies, remarking that some of the deficits were caused by mental retardation from inhalants, and some were caused by mental retardation from other factors. Retardation has, as the experts in this case all agreed, a number of etiologies.
Rivera, 505 F.3d at 363. The Court then quoted the applicable language from Atkins, as follows: “Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system.” Atkins, 536 U.S. at 308 n. 3, 122 S.Ct. 2242.
¶ 113. Clearly, mental retardation is: 1) subaverage intellectual functioning; 2) accompanied by related or significant limitations in two adaptive-skill areas; and 3) manifested before age eighteen. Doss has *735 significantly 1) subaverage intellectual functioning; 2) accompanied by related or significant limitations in two adaptive-skill areas; and 3) it manifested prior to age eighteen. Therefore, the inescapable conclusion is that Doss is mentally retarded. Under the applicable law and based on the facts of this case, it would be illogical to reach any other conclusion.
¶ 114. Moreover, the State’s experts testified that Doss was evaluated under the ninth edition of the AAMR pursuant to Atkins, and that they were under the mistaken belief that they were required to use this older definition of adaptive functioning rather than that contained in the tenth edition from 2002, which they used in their respective clinical practices. MacVaugh further admitted that using the more current tenth edition to evaluate Doss “could possibly change the diagnosis because the assessment of adaptive skill deficits would, would look different because the definition for them is different conceptually.” Therefore, even though the majority finds that there was insufficient evidence to support a finding of mental retardation, this matter still should be remanded for an additional evidentiary hearing to allow the State’s experts the opportunity to re-evaluate Doss pursuant to the current definition of adaptive functioning.
¶ 115. Because I would find that there is sufficient evidence to establish that Doss is mentally retarded or, in the alternative, that he should be re-evaluated pursuant to the tenth edition, I respectfully dissent.
KITCHENS, J., JOINS THIS OPINION.

. The Whitfield Report finds that Doss obtained a full scale IQ score of 71. However, Dr. Gilbert MacVaugh conceded at trial that he made a scoring error and that the correct hill-scale score should have been 70.

. Another IQ test was administered to Doss at North Mississippi Medical Center that produced a result of 80. However, this test was administered just a few months after the University of Mississippi test and was merely an estimated score based on a shortened version of an exam. Dr. Criss Lott, who was contracted by the Mississippi State Hospital to assist in the evaluation of Doss, acknowledged that this test was not a true result. Lott testified: "There could possibly be a practice effect there. It was also an estimated IQ. That is, they only gave four subtests. So it is not a full IQ. It wasn't a full evaluation in terms of using the full test itself. It was only four subtests.” Based on these factors and *727 others testified to at trial, the validity of this result is not reliable.

. Because there is no question that Doss meets the first prong of significantly subaver-age intellectual functioning, the majority's discussion regarding malingering is unnecessary and irrelevant. Moreover, the majority’s statement that “[t]he evaluation stated that [Doss’] true IQ score may have been higher, but possible malingering or fatigue may have factored in the scoring,” is incomplete. While the report did say Doss’ score may be higher, it also said Doss' true score may be three points less, or 67. Testimony also indicated that Doss' score could be considerably less. Further, the report specifically said fatigue may have factored into Doss' score on one measure of malingered memory deficits, i.e., TOMM, but also that Doss was cooperative and put forth a good effort.

. The majority discounts findings in the record that establish Doss' adaptive-skills deficits because these findings rely on interviews with Doss. However, the findings in the Whitfield Report substantially rely on interviews with Doss as well. Also, the findings in the Whitfield Report rely on interviews with Sadie Doss, yet the report notes that Sadie has previously been tested and received an IQ score in the mentally retarded range.

. Records indicate Doss passed Pre-Algebra with Support, which apparently consisted of two separate classes, including one with individualized assistance by a special education teacher. Doss failed Introduction to High *734 School English, General Science, Art, and Physical Education.

. The Whitfield report further states the "opinion is limited by a lack of available records related to Mr. Doss' school history and other prior intellectual assessments, as well as obstacles encountered when attempting to assess adaptive functioning in individuals who have been on death row for an extended period of time."