MERRITT, Circuit Judge,
dissenting.
My colleagues in the majority make short shrift of O’Neal’s mental retardation defense to his future execution. They do so very simply by holding that “reasonable minds” could differ on the question of O’Neal’s mental retardation. We are told that under the AEDPA we must accept the state court’s conclusion “based on an over-70 IQ score” that “O’Neal does not suffer from significantly subaverage intellectual function.” (Op. 1022-23.) This conclusion makes no sense because factual findings of intellectual normality “based on” a single “over-70 IQ score” are completely inconsistent with modern scientific opinion found in the psychiatric literature — the literature that the Atkins case requires the state and lower federal courts to apply.[1] We must apply neutral and objective standards as formulated by the consensus of experts in the field. Indeed, the Supreme Court in Atkins recognized that a single IQ test of 71, such as this one, could not be a proper basis for finding normality. It stated that the retardation literature con *1024 siders “that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition.” 536 U.S. at 309 n. 4, 122 S.Ct. 2242. The only relevant IQ testimony before the Ohio court and this court was that O’Neal’s IQ scores were all below 70, taking into account Dr. Robert Tureen’s testimony that the one 71 IQ score was something of an outlier. Dr. Tureen, the only psychiatrist who actually testified and administered tests, said that the 71 score was the result of an old Wechsler test which turned out to be 67 when the updated version was readministered. These facts are never mentioned. The Ohio court and this court seem to simply accept the 71 IQ score and then apply an Ohio presumption of normal intellectual ability if there is one IQ score above 70.
The American Association on Mental Retardation specifically cautions against such a fixed cutoff: “IQ has typically dominated and thus has been overemphasized both in terms of professional decision making and diagnosis.... This imbalance between intelligence and adaptive behavior does not represent the current conceptualization of mental retardation.” Mental Retardation: Definition, Classification, and Systems of Supports 80 (10th ed.2002). The most recent edition of the DSM, the American Psychiatric Association’s guide to mental disorders, also reflects the current understanding that a broader approach produces a more accurate assessment of mental retardation than a heavy reliance on IQ scores — much less the Ohio court’s finding based on one IQ test of 71. The manual states, “Individual cognitive profiles based on neuropsychological testing are more useful for understanding intellectual abilities than a single IQ score.” Diagnostic and Statistical Manual of Mental Disorders 37 (5th ed.2013). A clinical evaluation provides the necessary context for interpreting IQ scores, which cannot be viewed in isolation. See Mental Retardation: Definition, Classification, and Systems of Supports 58 (“[A] fixed cutoff for diagnosing an individual as having mental retardation ... cannot be justified psycho-metrically.”).
The one-test methodology for arriving at a “finding” of no retardation does not comply with the standards established by modern scientific opinion as required by Atkins. We therefore make a major mistake when we defer to a finding based on one IQ test, as the majority opinion suggests.
The only other evidence that the majority cites for its insistence that we must defer to the “findings” of the state court are the opinions of two mental health experts, neither of whom testified at the Atkins mental retardation hearing, Drs. Nelson and Chiappone. Dr. Nelson simply filed a short opinion without ever seeing, testing, examining, or observing O’Neal. This procedure seems contrary to common sense as well as the practice required by the American Association on Mental Retardation stating that rendering an opinion about an individual’s adaptive skills depends on personal contact, observation, and interviews. See Mental Retardation: Definition, Classification, and Systems of Supports 85-86.
Dr. Nelson, the state prosecutor, and the Ohio court rely on the fact that O’Neal served as a dishwasher, briefly had custody of his children, and served as a Marine to show that he performed well enough in his social adaptive functioning to be regarded as normal.. Dr. Nelson’s attitude towards dishwashing as a sign of intellectual functioning and social adaptation is far-fetched. O’Neal’s work with dishes, while perhaps exemplary, did not involve much reasoning, logic, or any skill indicative of strong adaptive behaviors. Retarded individuals can and do maintain employ *1025 ment and O’Neal was no exception. See Diagnostic and Statistical Manual of Mental Disorders 43 (4th ed.2000). And his work history as a dishwasher was not without problems — Dr. Nelson ignored the portions of the record that show that his work history was riddled with absenteeism and tardiness. O’Neal’s military “skill” is considerably less impressive when one considers that O’Neal went AWOL and was dishonorably discharged. His temporary custody of his children as a “skill” is no evidence of adaptable social skills. After all, O’Neal admitted to police that he did not even know where his young children were living and he then killed their mother — not exactly an indication of domestic normality. This set of facts offered in his uncross-examined opinion hardly rebuts Dr. Tureen’s comprehensive testimony.
Dr. Chiappone offered his evidence at the mitigation phase of the original trial. He did not purport to offer evidence concerning mental retardation as a bar to execution under Atkins standards. He simply acknowledged that O’Neal had a low level of intellectual ability and did not address adaptive skills or other factors recited in the professional standards relied on in the Atkins opinion and developed by the psychiatric profession.
Implicit in the opinion of my colleagues in the majority is the suggestion that they would reach a different conclusion if they did not have to “defer” to the state court’s “findings.” My view is that the state court’s opinion, based mainly on its reliance on its presumption, is a finding so far out of the mainstream of scientific opinion — indeed, directly contrary-to scientific opinion — as to deserve no deference. Moreover, the Supreme Court opinion in Atkins, as quoted above, appears to say that presuming normality from one IQ test of 71 is improper when the “cut off’ of mental retardation is considered to be 75. A state court opinion that defies both modern scientific opinion and applicable language in Atkins deserves no deference.
As to the other issues decided by my colleagues in the majority, I agree that O’Neal is not entitled to habeas relief.

. The Supreme Court makes the general standard for mental retardation plain by quoting two similar paragraphs from the two major scientific organizations that have formulated the standards for mental retardation evaluation, as follows:
The American Association on Mental Retardation (AAMR) defines mental retardation as follows: "Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.” Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992).
The American Psychiatric Association’s definition is similar: “The essential feature of Mental Retardation is significantly subav-erage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system.” Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000). “Mild” mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. Id., at 42-43.
Atkins v. Virginia, 536 U.S. 304, 308 n. 3, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).